The People v. New York and Harlem Railroad Company.

THE PEOPLE OF THE STATE OF NEW YORK and JAMES MURPHY and HUGH SMITH vs. THE NEW YORK AND HARLEM RAILROAD COMPANY, and the MAYOR, &c. OF THE CITY OF NEW YORK.

By the act incorporating the New York and Harlem Railroad Company, passed April 25, 1832, the company was empowered to construct a single or double railroad or way from any point on the north bounds of Twenty-third street, in the city of New York, to any point on the Harlem river between the east bounds of the Third avenue and the west bounds of the Eighth avenue, with a branch to the Hudson river, between One Hundred and Twenty-fourth street and the north bounds of One Hundred and Twenty-ninth street.

*Held* 1. That the practical location of the railroad within the prescribed limits would exhaust the powers conferred, and prevent a subsequent change of location, except by consent of the legislature.

2. That the location of the tracks (if there were two) would have to be substantially upon the same route. That the permission to build a double track should be construed to mean two tracks essentially upon the same location, for the purpose of enabling cars to run in opposite directions, and not two essentially different routes through different streets or avenues, such as would

The People *v.* New York and Harlem Railroad Company.

be occupied by parallel railroads; especially as the right of granting to other persons or corporations authority to construct parallel railroads on streets or avenues not occupied by the New York and Harlem Railroad Company, was expressly reserved to the legislature by the 16th section of the same act.

By an amendatory act, of the 6th of April, 1832, the company was "authorized and empowered, with the permission of the mayor, &c. of New York, to extend their railroad along the Fourth avenue to Fourteenth street, and through such other streets as the mayor, &c. might from time to time permit, subject to such prudential rules" as were prescribed by the act, and as the said mayor, &c. in common council convened, might prescribe. *Held* that the precise route of the extension was not intended to be defined by the act, but this was designedly left to the sound discretion of the common council; and the road was to be extended through such other streets as the mayor, &c. might from time to time permit.

That this was a continuous power, left to be exercised, from time to time, as the wants of the community should require. It was not therefore a power which was spent by a single grant or permission, but might be repeatedly exercised, according to the exigency of the case.

*Held, also,* that the extension authorized by the act of April 6, 1832, was a longitudinal, and not a lateral one; and it was not meant that it should pursue the same precise direction with that portion of the road to which it was attached, and not in any degree diverging from such a course, but that it should have the same general direction, as a southern, south eastern or south western direction, and not a direction to opposite or widely divergent points of the compass.

*Held, further,* that a reasonable interpretation of the act required that the extension should be made from the termination of the road already constructed, so as to be a legitimate continuation and prolongation thereof. That it was to go further—not to return back. It was to be continued, not to branch off. It was to be a single route, not several routes. It was to be an extension, and not a branch.

Accordingly, the common council of New York having professedly in pursuance of the authority, given by the act of April, 1832, passed an ordinance on the 21st of April, 1863, granting permission to the New York and Harlem Railroad Company to extend its railroad, and construct a double track from their present Fourth avenue track, between Seventeenth and Fifteenth streets, through Broadway, to the foot of Whitehall street, with an additional track around Bowling Green and State street, and another additional single track around Union square; with further permission to construct an additional single track to the Fulton ferry, through John street, &c. returning through Fulton street; and to extend its railroad and construct a double track from the present track in Fourth avenue, through Twenty-third street to Madison avenue, and thence through Madison avenue as far as it is or hereafter may be opened; with further permission to connect therewith by a single or double track from Fourth avenue to Madison avenue, through Twenty-fourth street;

*Held* that the permission attempted to be granted by the ordinance was not warranted by the terms, intent or fair interpretation of the act of April 6, 1832.

*Held, also,* that the permission granted by the common council, to the railroad company, was not maintainable as a lawful exercise of power granted to the common council under the ancient Dongan and Montgomery charters, independent of any statutory grant or authority.

All public streets and highways are for the use of the people of the whole state, whether located in town or country. · The interest in such use, or the ownership thereof, is *publici juris ;* and the appropriation of such streets to private or corporate use, without authority of law, and the consequent obstruction of them, and impediments to travel occasioned thereby, constitute a *nuisance,* and justify an injunction. And the *people of the state* are the appropriate parties to seek and enforce the necessary remedy.

In an action brought against a railroad company to obtain an injunction restraining the extension of its road, in the city of New York, and to annul and declare void an ordinance of the common .council, granting permission to the company to extend its road, the city corporation is a necessary and proper party, *it seems,* where the common council, on granting such permission, has reserved to the city ten per cent of the gross receipts from travel on the portion of the road to be extended.

But an injunction will not be granted, in such an action, against the corporation, where there is no allegation that it is about to do, or that it threatens, any act whatever obstructing or incumbering the streets, or otherwise, in execution of the permission granted; and it is not alleged, nor does it appear, that the railroad company, in executing the ordinance, is the agent of the corporation.

HEARING, on an order granted by Justice PECKHAM to show cause why an injunction should not issue against the defendants, the mayor, aldermen and commonalty of the city of New York, restraining them from granting to the New York and Harlem Railroad Company the right to lay or construct a railroad track or tracks in any of the streets or avenues in the city of New York, and from authorizing said company to lay a railway or track in Fourth avenue, Madison avenue, Union square, Broadway, Fulton street, John street, Whitehall street, or any of them, or to break and remove the pavement thereof, or in any manner obstruct said streets, preparatory to or for the purpose of laying or establishing such railroad track or railway therein, and also restraining the New York and Harlem Railroad Company from laying or

constructing such railway or track in any of the streets or avenues aforesaid, and from breaking or removing the pavements therein, and from obstructing or incumbering any of such streets or avenues for such purpose, or disturbing or interfering with the carriage way thereof, or interrupting the travel thereon, and granting a temporary injunction of the same purport against the New York and Harlem Railroad Company in the mean time.

*Lyman Tremaine, A. R. Lawrence, Gilbert Dean, Waldo Hutchins, John H. Reynolds,* for the plaintiffs.

*John K. Hackett, Charles A. Rapallo, Horace F. Clark, Augustus Schell, John K. Porter,* for the defendants.

*By the Court,* HOGEBOOM, J.   On the 21st day of April, 1863, the common council of New York passed an ordinance, which was subsequently approved by the mayor, granting permission to the New York and Harlem Railroad Company to extend their railroad and construct a double track from their present Fourth avenue track, between Seventeenth and Fifteenth streets, through Broadway to the foot of Whitehall street, with an additional single track around Bowling Green and State street, and another additional single track around Union square, with further permission to construct an additional single track to the Fulton ferry, through John street, Burling slip, and South street, returning through Fulton street.   Permission was also thereby granted to said company to extend their railroad and construct a double track from their present track in Fourth avenue, through Twenty-third street to Madison avenue, and thence through Madison avenue as far as it is, or hereafter may be opened, with further permission to connect therewith by a single or double track from Fourth avenue to Madison avenue, through Twenty-fourth street.

It was provided in the ordinance that the company should

pay to the comptroller of the city, monthly, for the benefit of the city, ten per cent of .the gross receipts from all the travel below Union square upon said authorized extensions. Also, that the company should, at their own expense, keep in repair the pavements between the curbs in the streets occupied or traversed by their extended railroad—should pay a license fee of twenty-five dollars for each car run upon the same, and should conform to some other provisions contained in said ordinance, not necessary to be here particularly enumerated, designed to insure the safety and convenience of the traveling public.

The New York and Harlem Railroad Company, pursuant to another provision in the said ordinance, notified their acceptance of the said ordinance within ten days after its passage.

By a preamble to the said ordinance, it is manifest that the common council relied, for their authority to grant the permission before recited, upon an act of the legislature of the state of New York, passed April 6, 1832, and entitled "An act to amend an act entitled an act to incorporate the New York and Harlem Railroad Company, passed 25th April, 1831," which authorized and empowered the New York and Harlem Railroad Company to extend their railroad through such streets in the city of New York as the mayor, aldermen and commonalty of the city might from time to time permit.

And the main questions in this case arise upon the construction to be given to that act; whether the power, thereby conferred, has been exercised and exhausted; whether the laying down and construction of the railroad tracks, authorized by the ordinance, are a legitimate exercise of the right to extend their railroad, conferred by the amendatory act of 1862; and whether the latter act has been expressly or impliedly repealed by subsequent statutes abrogating the same or inconsistent therewith.

Some of these questions it will be necessary to consider.

The New York and Harlem Railroad Company was incorporated by an act of the legislature, passed April 25, 1831. They were empowered to construct a single or double railroad or way from any point on the north bounds of Twenty-third street to any point on the Harlem river, between the east bounds of the Third avenue and the west bounds of the Eighth avenue, with a branch to the Hudson river between One Hundred and Twenty-fourth street and the north bounds of One Hundred and Twenty-ninth street. The practical location of the railroad within these prescribed limits would, I think, exhaust the power conferred, and prevent a subsequent change of location, except by consent of the legislature.

· The line of road, it will be observed, was only from New York to Harlem. · The location of the tracks (if there were two) would have to be, I think, substantially upon the same route. The permission to build a double track would be construed to mean, I think, two tracks essentially upon the same location, for the purpose of enabling cars to run in opposite directions without detention or collision — and not two essentially different routes through different streets or avenues, such as would be occupied by parallel railroads. Indeed, the right of granting to other persons or corporations authority to construct parallel railroads on streets or avenues, not occupied by the New York and Harlem Railroad Company, was expressly reserved to the legislature by the 16th section of the same act.

Then came the amendatory act of the 6th of April, 1832, on which the defendants rely. By it, this company were "authorized and empowered, with the permission of the mayor, aldermen and commonalty of the city of New York, to extend their railroad along the Fourth avenue to Fourteenth street in the said city, and through such other streets in the said city as the mayor, aldermen and commonalty of said city might from time to time permit, subject to such prudential rules as were prescribed by this act; and as the

said mayor, aldermen and commonalty, in common council convened, might prescribe."

By this act, the railroad, which before terminated at Twenty-third street, was permitted to be extended, that is continued or prolonged, to Fourteenth street. This was ten streets further south, upon the same avenue. But it was foreseen that public convenience and travel might require its further extension, and I think this was intended to be in the same general direction. It could not be extended further north, for it already extended in that direction to the Harlem river, and there were no streets beyond that river. The intent of the legislature was, I have no doubt, that it might be extended further south, if the interest of the community should require, and through such other streets, proper to accomplish that purpose, as the mayor, aldermen and commonalty might from time to time permit, not necessarily to terminate at the end of the Fourth avenue, at the junction of Fourth or Fifth street, for it was foreseen that the public accommodation might require it to be carried further down; not necessarily to terminate at the end of the Bowery, for a large portion of the population and business of the city was still below that; not necessarily, perhaps, pursuing the route of either of these streets — at all events, not necessarily ending at their southern terminus, but through such other streets as the city authorities might permit or prescribe, consistently with the main purpose of the act. At the end of the Bowery, several streets diverged to the south, or in that general direction. The precise route was not intended to be defined, but this was, I think, designedly left to the sound discretion of the common council, having reference to the traveling and business interests of that crowded mart, and it was to be extended through such other streets as the mayor, aldermen and commonalty might from time to time permit. I see no reason to doubt that this was a continuous power, left to be exercised, from time to time, as the wants of the community should require. It was not therefore a power

which was spent by a single grant or permission, but might be repeatedly exercised according to the exigency of the case.

Whether the power, when once exercised and acted upon by the laying down of a track in accordance with the permission given, could be recalled, the track broken up, and a new route prescribed, is a question which is not necessary to be decided, and which I shall not discuss—it has its difficulties.

But I am strongly inclined to think that the extension authorized by this act was a longitudinal, and not a lateral one. A lateral road is more properly a branch than an extension. It is spoken of under that name in the first section of the act of 1831, where authority is given to construct a branch to the Hudson river—that is, a road or route diverging from the main trunk of the railroad. So by the first section of the amendatory act of May 12, 1836, authority is given to alter and change the route or location of the branch of their railroad, which is to be constructed from the Fourth avenue to the Hudson river. So by the first section of the act of May 7, 1840, the right is granted to build a railroad through the county of Westchester, "extending thence northwardly to an intersection of the New York and Albany Railroad Company's line of road, and the right of extending a branch eastwardly to the state of Connecticut."

In saying that I think the extension authorized by the first section of the act of 1832 was intended to be longitudinal and not lateral, I do not mean that it should pursue the same precise direction with that portion of the road to which it was attached, not in any degree diverging from such a course, but that it should have the same general direction as a southern, southeastern, or southwestern direction, and not a direction to opposite, or widely divergent points of the compass.

For example, it is very possible that under the act of 1832, the New York and Harlem Railroad Company might, with the permission of the local authorities, if they had not

The People *v.* New York and Harlem Railroad Company.

located any other route, have diverged to the west at Fourteenth street, and passed down Broadway. There seems to be no absolute requisition that they should continue on the Fourth avenue below Fourteenth street, and there is no other street or avenue at that point on which they could pass, except Fourteenth street, and no street, after such divergence, by which they could so soon return to the same general course as they had before pursued as Broadway.

But it is a different question, whether, after having practically located their road by a double track below Fourteenth street, through the Fourth avenue, the Bowery, Broome and Centre streets to the lower end of the Park, used it in that location for a series of years, and maintained it in full operation to the present time, insisting still upon retaining that route, they can, in addition, locate and operate an entirely new and supplemental route through Sixteenth street, to Union park, and thence through Broadway to the foot of Whitehall street. I think they can not, and in part for these reasons :

1. Such a route would be an entirely new and independent route, as much so as if pursued under independent authority from the legislature to another corporation. It is, in effect, a parallel route, which the legislature have, in the sixteenth section of the act of 1831, reserved to themselves the right to grant to a distinct corporation. It would give to this company the right to operate a double track in two locations entirely distinct. This was not intended by the legislature. This power was not conferred by the act of 1831, and although the act of 1832 makes no mention of a limitation to a double track, it must be construed in connection with the charter of 1831, being an amendment thereof, and not enlarging the powers of the corporation in this particular.

The effect of the defendants' interpretation is to authorize this corporation, with the consent of the local authorities, to lay and construct railroads over every unoccupied street and avenue of the Island of Manhattan. It is unreasonable to

suppose that the legislature intended to invest this company, even under the superintendence of the common council, with powers and privileges so sweeping and comprehensive. The act must receive a reasonable interpretation, confining it substantially to the main purposes of its original enactment, except so far as additional powers are plainly conferred.

2. Nor is this new route, in any just sense, a mere extension of the original railroad. That road had an obvious limitation, by the terms of the charter, to a single route, though with a double track. It was designed to open a railroad communication between New York, at Twenty-third street, and Harlem. Below that point, it was probably supposed that the public could be advantageously served by stages and other conveyances. By the act of 1832, permission was given, under certain limitations, to extend this route further south, doubtless with a view to public accommodation in the more southern portion of the city. In 1840, permission was given to extend it in the other, the northerly direction. In 1845, by the act of May 14 of that year, this power was conferred in more distinct and ample terms, to continue their road to a point on the Hudson river, opposite Albany. But it was probably never imagined, even by those interested in the corporation, that these acts invested the company with authority to establish parallel lines of railroad over the intervening territory between New York and Albany. Nor is it in my opinion a just construction of this act to give it a wider scope, in regard to its extension at the southern terminus, further than required by the plain terms, or obvious meaning of the language employed. It may extend through such other streets as the common council may designate, but only through such other streets as may subserve the leading object of the extension, to wit, a continuation of the road to more southern portions of the Island.

I think, further, that a reasonable interpretation of the act requires that the extension should be made from the terminus of the road already constructed, so as to be a legit.-

mate continuation and prolongation thereof. It was to go further—not to return back. It was to be continued, not to branch off. It was to be a single route, not several routes. It was to be an extension, and not a branch.

I am not able to give this act any other construction. I therefore conclude, that the permission attempted to be granted by the ordinance of the 21st April, 1863, was not warranted by the terms, intent or fair interpretation of the amended charter of 1832. This view is sufficient to dispose of the main question in the case, and makes it unnecessary for me to consider such of the other questions presented as relate to the supposed repeal of this act, by the passage of other acts inconsistent therewith.

There is an additional ground on which the defendants rest the justification of their proceedings in this case, and that is: that, independent of any statutory grant or authority, the permission granted by the common council to the New York and Harlem Railroad Company is maintainable as a lawful exercise of power granted to the common council, under the ancient Dongan and Montgomery charters. But to this view of the case I think there are several answers:

1. The permission granted to the railroad company was, by the terms thereof, confessedly based upon the authority conferred by the amended charter of 1832. It professed to be derived from that source and no other. Under that all the parties acted, and there is some reason for saying that, to that the parties should be limited.

2. But whether so or not, it is no longer a debatable question, at least in this tribunal,

(1.) That the legislature have, notwithstanding these charters, the right to make grants of railroad privileges and franchises, over the streets and avenues of the city, and that when this power is exercised, it is superior to and exclusive of any power which previously resided in the local authorities; and, (2.) That the local government has no right to grant railroad privileges or establish railroads in cities inde-

pendent of legislative action and approval.    I must therefore overrule this ground of defense.

I think it is also settled, upon authority, that all public streets and highways are for the use of the people of the whole state, whether located in town or country, that the interest in such use, or the ownership thereof, is *publici juris;* that the appropriation of such streets to private or corporate use, without authority of law, and the consequent obstruction of them, and impediments to travel occasioned thereby, constitute a nuisance, and justify an injunction, and that the people of the state are the appropriate parties to seek and enforce the necessary remedy.   Hence, in this case, the action is well brought in their behalf.   If so, it would not furnish a sufficient objection to the granting of an injunction, even if the other plaintiffs were improperly joined.   I can not say they are so, for although they might not have a good cause of action if the defendants were proceeding lawfully under valid grants, they may, nevertheless, sustain serious damages by the acts of the defendants, and if such acts are unlawful, perhaps be entitled to the preventive remedy of injunction.

There are one or two other objections peculiar to one of the defendants, to wit, the corporation of New York, which it is necessary to consider :

1. It is said that this defendant can not be prosecuted in a civil action otherwise than in the first judicial district.

2. That this defendant has no interest in the subject matter of the suit or injunction, and is not a necessary or proper party to the action.

3. That on the plaintiff's own showing there is no cause of action, and no ground for an injunction against such defendant.

I will examine these questions briefly.

(1.) Section one of the act of 14th of April, 1860, (*chap.* 379,) declares that "the Supreme Court in the first judicial district, the Court of Common Pleas, and the Superior Court of the city of New York, shall have exclusive jurisdiction

of all actions or special proceedings wherein the mayor, aldermen and commonalty thereof are made a party defendant." This language is very comprehensive, but, I think, it never could have been intended to locate all actions in the city of New York, in which, whatever might be the cause of action, or wherever situated, or however numerous the parties might be, the corporation of the city was made one of the defendants. If such was the intention, the law ought to be speedily repealed. It is susceptible of another interpretation, which is more agreeable to the probable intention of the legislature, and I think it should receive such interpretation. It may read, that in actions in the first judicial district, the Supreme Court, the Court of Common Pleas and the Superior Court shall be the sole tribunals to try causes in which the corporation is impleaded. Even this is a more liberal construction than was, I think, intended by the legislature.

I think the object of the legislature was to limit the jurisdiction to the specified tribunals in cases where the corporation was the sole defendant—or else, where the action was to recover a claim against the corporation. This is a reasonable inference from the phraseology of the second section, and I should give it that construction if it were necessary to decide that question in the present instance; which it is not necessary to do for reasons to be presently given.

(2.) Nor is it necessary to pass definitively upon the question whether a cause of action is stated in the complaint against the corporation, or whether it is a necessary or proper party to the suit. Notwithstanding the case referred to in the defendants' points, and decided in the first district, I am inclined to think the mayor, aldermen and commonalty of New York were proper parties to the action, inasmuch as the object of the action is not only to obtain the injunction, but to annul or declare void the ordinance, in maintaining which, this defendant may claim and apparently has an important pecuniary interest to the extent of ten per cent of the gross

receipts from travel below Union square, doubtless expected to reach a very large amount.

(3.) But, upon the facts stated in the complaint, I do not see any cause for an injunction against the corporation. There is no allegation whatever, that they are about to do or that they threaten any act whatever obstructing or incumbering the streets or otherwise, in execution of the permission granted, nor is it alleged, nor does it appear, that the railroad company, in executing the ordinance, are the agents of the corporation, but it is rather to be inferred that they are independent contracting parties.

For these reasons, I am of opinion that the motion for an injunction against the mayor, aldermen and commonalty of the city of New York should be denied, and the temporary injunction dissolved, with ten dollars costs : but as against the other defendant, the New York and Harlem Railroad Company, that a motion for an injunction should be granted, and the temporary injunction continued — ten dollars costs of making and opposing the application, to abide the event of the action.

[NEW YORK SPECIAL TERM, October 28, 1864. *Hogeboom*, Justice.]