# SUPREME COURT.

## Frederick Humphreys agt. Francis W. Hurtt.

*Reformation of written agreements — principles controlling in their determination.*

1. Where parties have entered into a written contract, it must be presumed in law to express their common intention and to speak their actual agreement.
2. If such contract is alleged not to express the real intent of the parties, and that fact is shown by sufficient evidence, a court of equity can correct the alleged mistake in favor of the party prejudiced.
3. The proof required to correct such mistake must be clear and unequivocal.
4. As a general rule the mistake which will afford ground of reformation of an expressed contract must be of a mutual character ; in other words, the mistake must be reciprocal and common to both parties.
5. If one party, in the execution of a contract, has delivered or received papers in supposed furtherance of it, but with knowledge of a mistake made in his favor, which he conceals, then equity will reform the contract or give relief to the other party if the mistake is clearly shown, although it be not mutual.
6. If the mistake has not been mutual, but made inadvertently on one side, and yet in good faith by the other, if any amendment or reformation of the contract can under any circumstances be made, it cannot be made so as to make the agreement conform merely to the views of the party applying, but only to the original views of both parties.

In this case there is not sufficient evidence of mistake on the part of the plaintiff, to warrant the setting aside of the deliberate agreement made between him and the defendant.

Even if the plaintiff were mistaken and the defendant not — there having been no rescission or offer to rescind, so that the defendant might be placed in *statu quo*, the contract cannot be nullified and a new one imposed on the defendant which he had not contemplated.

Neither is there any evidence of any willful misleading of the plaintiff, or knowledge of mistake on the part of the defendant and a silence kept

under it, so that plaintiff, as claimed, was fraudulently misled to his injury.

*First Department, June,* 1875.

*Ira Shafer & William Sutphen,* for plaintiff.

*Coles Morris & Michael H. Cardozo,* for defendant.

OPINION OF REFEREE.

JAMES W. GERARD, *Referee.*—This is an action of an equitable character, brought to enforce the reformation of a written agreement alleged to have been made by the plaintiff, under a mistake, and under circumstances of knowledge and procurance by the defendant amounting to a constructive fraud, or under a mutual mistake, and contrary to the mutual understanding and true intent of the parties, who are respectively plaintiff and defendant in the action. There are certain facts which appear conceded, which are briefly as follows:

That prior to the making of the agreement each party had an interest equal to forty-four one-hundredth parts respectively in the incorporated company mentioned in the pleadings, the remaining twelve one-hundredth parts being owned by one Palmer.

That the assets or capital of the company were mainly represented by two species of business:

*First.* The exclusive right of manufacturing and selling a medicine called "Pond's Extract."

*Second.* A similar right in certain medicines called "Humphrey's Specific Homœopathic Medicines."

There was also manufactured stock on hand, of each business, and certain material and property incidental to their manufacture and sale. There were also outstanding accounts and bills receivable of the company, and an outstanding indebtedness.

The interests and obligations of each of the parties to the action in the above were equal, and the business was for a

time conducted harmoniously and prosperously, but on account of a want of congeniality or some personal differences, it was determined that the interests of the parties should be severed, and a division of the subject-matter of the association made, so far as the parties litigant were concerned.

The desire for a separation seems, from the testimony, to have been mutual. Besides a want of concord between the principal parties, there appears to have been antagonistic feeling between the plaintiff and Cole, one of the employes, and a particular friend of the defendant.

There was also a desire, on the part of the plaintiff, to have his son engaged with him in the business.

Various interviews and negotiations appear to have taken place between the parties prior to the time of the written agreement in question, resulting, as is claimed by plaintiff, in a verbal agreement to divide their respective interests according to a certain basis of division, the terms of which, as claimed by the plaintiff, were, through inadvertence or mistake not represented by the written agreement subsequently made, on or about December 5, 1872, and which is annexed to the complaint. The terms of settlement, as claimed by plaintiff, were to be an equal division based on an actual moneyed estimate of values, or differences of values of the respective species of business, and of the stuff and debts on hand, which values and differences of values (as it is claimed) were mutually conceded as fixed at ascertained or ascertainable amounts.

Under this view, the plaintiff claims that the Pond's Extract business was mutually estimated and stated at $75,000 and the specific medicines at $105,000, making a difference in favor of specifics of $30,000. He also claims that the stock or material of specifics on hand was worth $19,000, and that of Pond's Extract, $8,000. That the outstanding accounts were worth $30,000 (less $1,000 for collection), and that the indebtedness of the company was $10,000. That Palmer's (the third person's) interest was fixed at $6,000 in

the accounts due and stuff on hand, and his interest in the difference in value of the two medicines was fixed at $3,000.

The plaintiff further alleges that afterward, and "in conclusion of said negotiations and agreement," it was finally agreed that the branches of business should be divided thus :

That plaintiff should take all right in the specific medicines and in all the other rights and business and assets of the company, and that defendant should take the exclusive right to "Pond's Extract" and the stock thereof on hand, less what was then in the company's retail stores.

The plaintiff's further claim is, that it was thereupon mutually agreed, as the basis of the written agreement to be made, that the difference in value of the two medicines should be $30,000 as above, and that the total value of all other assets should be $57,000, as above specified. That the indebtedness should be ($10,000 — $1,000) $9,000, and Palmer's interest $9,000, and that the plaintiff should pay to defendant one-half the difference in value "between the assets and property to be received by defendant" as above estimated, which difference was estimated at $51,000, and to be paid in certain specified installments.

The plaintiff then charges that the agreement was to have been drawn on the above basis, but that the defendant, by design, caused a different agreement to be drawn, which is the one sought to be reformed.

This agreement recites the equal interests of the parties in the stock of the company; the desire of plaintiff to buy out defendant, and that plaintiff agrees to buy out the defendant's interest in the stock and assets of the company on the terms specified, viz., that all the interest of the company and of plaintiff in the Pond's Extract is to be transferred to defendant, and also all the stuff and property relating thereto on hand, except that in 562 and 817 Broadway. That plaintiff shall pay defendant $14,000 on the second day of February next, and $36,300, in two years, in certain weekly installments, with a rebate or discount on certain installments.

The defendant agrees on his part to resign his position as actuary of the company, and consequent right to a salary of $4,000, and to release the company from all its obligations or contracts to him, and not to interfere with the company except to vote on the shares of his stock, which are to be deposited in escrow, to be delivered after payment of the full sum of $50,300.

The plaintiff further agrees to assign certain portions of stock to some person for.the purpose of qualifying him as a new trustee, and that any vacancies in the board of trustees shall be supplied.

There is a provision of forfeiture of past payments in case of failure by Humphreys, the plaintiff, to perform the agreement.

A bill of sale was executed at the same time by the company and plaintiff to the Pond's Extract Company, a company representing the defendant, transferring, for the consideration of one dollar, all interest in the Pond's Extract, and in all property and stock connected therewith as specified in a schedule. This bill of sale is signed by plaintiff twice, once in his capacity as president and again individually. It is also signed by the defendant and Palmer.

It is claimed by plaintiff that the agreement and bill of sale was but hastily read to and signed by him, and that he did not notice that the gross sum of $53,300, which he stipulated to pay in the agreement, was greatly in excess of the sum that he had agreed to pay ; and also that he did not notice that in the written agreement he transferred the Pond's Extract stuff to defendant, without any consideration or allowance therefor, or deduction of the value thereof from the gross sum, or that the aggregate sum of $15,000 had not also been allowed to plaintiff.

All this is alleged to have been done knowingly by the defendant and ignorantly by the plaintiff, and in violation of the terms of the original compact.

It is also alleged by the plaintiff, and it appears in evidence,

that several days after the execution of the written agreement and bill of sale, and "pursuant to the terms of the written agreement," the stock of the defendant was transferred in escrow.

It also appears in the evidence that at the instance of the plaintiff a written modification of the agreement was subsequently executed by the parties, about a month after the execution of the first agreement. This modification is given as an exhibit of the complaint.

It makes no change in the original agreement further than in extending and altering the time for the payment by plaintiff of the installments of the $36,000 and providing for interest on certain balances. It also provides that so long as the plaintiff fulfills his part of the agreement, the defendant is not to vote on the stock in escrow, except for the present trustees, but that the plaintiff is to have all dividends thereon, and is to have the stock transferred to him, when all the payments provided for in the agreement are made.

I do not find any allegation in the complaint, or any proof that this modified agreement was made hastily or inadvertently, or without knowledge of its contents and purport on the part of the plaintiff.

The plaintiff further claims that the alleged errors were not discovered by him until "some time" after the execution of the agreement and bill of sale, and that as soon as he discovered the errors alleged, he called upon the attorney who had prepared the papers, and required them to be reformed, but that it was stated that it could not be done. The plaintiff claims that the various payments under the agreement were made under fear of the forfeiture clause of the agreement unless the payments were made, which payments amounted to over $22,000.

The plaintiff also claims, in support of his case, that he was unacquainted with the business matter of the company, but that defendant was acquainted with all the details of the same.

Humphreys agt. Hurtt.

The actual relief practically sought by the plaintiff from the court is that, under the circumstances, the written agreement is unjust and inequitable, and a reformation of it is claimed so that the words twelve thousand one hundred and fifty dollars be inserted in place of thirty-six thousand three hundred dollars, and that the words twenty-six thousand six hundred and fifty dollars be inserted in the place of fifty thousand three hundred and fifty dollars. In other words, that the moneys to be paid to the defendant under the written agreement be reduced by $23,700.

The theory of the defendant is, that on account of mutual dissensions and disagreements, the agreement in question was made, which in its terms was the result of various negotiations, investigations and estimates, changed, modified or rejected from time to time, and that the written agreement was the result of a compromise between the two parties, which resulted in the settlement of the difference in the value of their interests in the two branches of their business at $27,000 in favor of the specific business, to be paid to the party relinquishing his share in said business, and that the party taking the "Pond's Extract" business should be entitled to all the property belonging to that branch, and also to $20,000 in settlement for all his interest in the other assets.

This view, it will be seen, is in accordance with the written agreement, except that an extra amount of above $3,300 was to be paid for interest on deferred payments. The defendant claims that thereupon the agreement was drawn out by the lawyer of the company, under the written directions of the plaintiff, in accordance with the above settlement; that the agreement was read over to him before he signed it without objection on his part to the above terms, that he subsequently executed the bill of sale in accordance with the terms, and entered into the possession of the property given to him pursuant to it, and made the payments prescribed in the agreement.

That afterward the modified agreement was executed by plaintiff, ratifying substantially the original agreement, and that the whole claim of the plaintiff is an afterthought, and a fraudulent design to avoid his written obligation.

The defense also claims that plaintiff acted with full knowledge of the business of the company and all its details, and that the agreement was made with the concurrence of Palmer, who still retained his interest, viz.: 120 shares of the stock of the company.

That in giving up his interest in the company, the defendant lost a right to a salary for $4,000 a year for life, and about $11,000 annually as dividends, and that even on an investigation of assets it would be found that the defendant was to receive under the agreement at least $10,000 less than the value of his share.

The defense also alleges that in addition to the $47,000 which, in pursuance of the compromise, was to be paid him, it was also agreed that $3,300 should be paid him to cover interest on the deferred payments provided for in the agreement, by reason whereof the aggregate amount of cash to be paid was $50,300, as provided in the agreement.

The above seems to be a substantial summary of the facts and views urged by plaintiff and defendant respectively in the presentation of their case. It will be observed that the general theory of the plaintiff's claim to relief is, that the sum agreed to be paid was based on recognized values and a mathematical calculation thereon, which, through error or fraud, is not fairly represented by the written agreement.

The general theory of the defense is, that the values and differences in value, debts and other assets, were not susceptible of exact estimation, and that the liquidated amount agreed on was the result of general estimates, and considerations, and mutual compromise.

Although actions of an equitable character are ordinarily so variant as to the facts of each case as not to be subject to the absolute application of defined legal principles, the courts

of this state have laid down certain general canons as to actions brought for the rectification of contracts alleged to have been made under mistake.

The following principles are to be gathered from the decisions of our tribunals as controlling such actions :

1. That where parties have entered into a written contract, it must be presumed in law to express their common intention and to speak their actual agreement.

2. That if such contract is alleged not to express the real intent of the parties, and that fact is shown by sufficient evidence, a court of equity can correct the alleged mistake in favor of the party prejudiced.

3. That the proof required to correct such mistake must be clear and unequivocal.

4. That as a general rule the mistake which will afford ground of reformation of an expressed contract must be of a mutual character; in other words, the mistake must be reciprocal, and common to both parties.

5. That if one party, in the execution of a contract, has delivered or received papers in supposed furtherance of it, but with knowledge of a mistake made in his favor, which he conceals, then equity will reform the contract or give relief to the other party, if the mistake is clearly shown, although it be not mutual.

The case, then, comes under the head of a constructive fraud on the part of one party, and of a mistake or error on the part of the other. Under this class are more particularly placed those cases where the party committing the fraud has himself so drawn or caused to be drawn the agreement as to mislead the other. In this class of cases no offer of immediate rescission is required, but relief may be given if applied for within a reasonable time.

6. That if the mistake has not been mutual, but made inadvertently on one side, and yet in good faith by the other, if any amendment or reformation of the contract can, under any circumstances, be made, it cannot be made so as to make

the agreement conform merely to the views of the party apply-
ing, but only to the original views of both parties.

In this latter case there may be a rescission on the ground
that the parties' minds never met, but there can be no reforma-
tion or change of the contract making it substantially a new
one.

The doctrines above expressed may be gathered from the
following cases: *Bottsford* agt. *McLean* (45 *Barb.*, 78); *Rider*
agt. *Powell* (28 *N. Y.*, 310); *Welles* agt. *Yates* (44 *N. Y.*, 525);
*Nevins* agt. *Dunlap* (33 *N. Y.*, 676); *Lyman* agt. *United States
Ins. Co.* (14 *Johns.*, 373); *Kent* agt. *Manchester* (29 *Barb.*,
597); *Humphreys* agt. *Hurtt* (*Sup. Ct., First Dep.*, 1874);
*McHugh* agt. *Imperial Fire Ins. Co.* (*Superior Ct., Dec.*,
1874).

It is to be observed as to this case, with respect of the above
rules, that there has never been any offer to rescind on the part
of the plaintiff, nor any application made to the court for that
purpose, and it was admitted by both parties on the argument
that it was now impracticable to rescind the contract. The
action, therefore, is to obtain a reform or change of the con-
tract to meet the views alleged to have been entertained by
the plaintiff, whether the defendant entertained them or not.
Unless, therefore, the mistake has been mutual, or a knowl-
edge of an actual mistake, contrary to the mutual original
intent of defendant as well as plaintiff, is brought home to the
former, there can be no such reformation as is claimed, nor,
in fact, any change made in the contract.

Under the above cases it would be out of my province, or
the province of any court, to impose upon one party a new
contract which he had never intended, in order to give relief
to a party to a contract which he had never intended to make.

The evidence in this case I have reviewed and analyzed with
great care and an ardent desire to come to a determination
consonant with the truth and equity of the case.

The evidence is quite contradictory. The plaintiff swears
directly that the original understanding was not in accordance

with the agreement as drawn, and that he signed the latter under a mistake, supposing that it was according to what that original agreement was.

The defendant contradicts flatly the plaintiff's statements, and they mutually contradict each other as to what passed in their various interviews preliminary to the written agreement. They are each more or less supported by witnesses called to corroborate their respective testimony.

I will refer to some main facts that seem conclusively established. It is evident that, although the agreement might have been mechanically drawn in haste, its preparation was attended with ample time for reflection and the exercise of judgment. There was neither duress, misrepresentation or undue influence. There were many preparatory interviews and conversations on the subject of the separation, commencing in November, 1872, and there had been interviews on the subject, plaintiff states, even months and years before that. There was inquiry made by both parties of the book-keeper; a statement from him was given, and investigation of the books and previous inventory was made. Both parties were of mature age, and men of intelligence and education. There is also competent evidence showing that the plaintiff as well as the defendant had knowledge and experience in the actual management of the business. The directions for the drawing of the agreement were sent to the company's lawyer by the plaintiff himself, after an interview between the parties, when the amount to be paid was reduced by mutual consent from $30,000 to $27,000. The draft of the agreement was read over to both at least a day before its execution, and assented to, except as to features that were changed by mutual consent. After the agreement was finally drawn for execution, it was read over to all parties and signed without further objection or alteration, as also was the bill of sale connected therewith. This was on the 5th or 6th of December, 1872. Nearly a month afterward was drawn, at the request and instance of the plaintiff, and under his direction, a modification of it, and executed by both

parties, as to matters not here complained of, but impliedly ratifying the first agreement.

Payments were made under the agreement from its execution up to the commencement of this action. The conditions of the paper were carried out by both parties. No offer was made to rescind it, or effort to reform it on the part of plaintiff, until the present action was instituted, in December, 1873, about a year after its execution, and no positive demand was made on defendant by plaintiff for its reformation until by letter of August, 1873.

It is in evidence, also, that, intermediate the signing of the first agreement and the modified one ratifying it, the plaintiff was in consultation with his counsel, Mr. Nelson, relative to the agreement and the subject-matter thereof.

With all these facts, I am called upon to hold that the plaintiff was acting all the time under a mistake, and while the executed agreement obliges him to pay $50,350, he only intended to pay $26,650.

In the investigation of the evidence, I am obliged to pay a judicial regard to the well established rules of testimony that throw a strong burthen of proof on the plaintiff. First, in that he is plaintiff in the action. Secondly, that in cases of this character, where an executed written agreement is sought to be avoided, the evidence of mistake must not only be very clear, but manifestly preponderating.

The plaintiff's theory that, in arriving at a basis of his payments, he made a mistake in not halving the alleged difference between the values of the two branches of interests, instead of stipulating to pay the whole, involves two considerations: First, was $30,000 agreed on as the basis of difference? And secondly, did he make a mistake in not halving it, or was the $30,000 a sum mutually agreed on as the money to be paid by the plaintiff, in view of the various rights and views of the parties, and the difficulty of their arriving at exact money valuations?

I do not think the evidence is sufficiently clear to warrant

me in finding that $30,000 was positively agreed upon as the difference in value between the "specifics" and the extract.

Other sums, apparently, were in discussion or in contemplation between the parties, unless I am willing to entirely discredit the evidence of Palmer and Johnson, as well as that of the defendant, which evidence is unimpeached, and which I cannot do, although it is certainly tinged with a bias in favor of the defendant; no more, however, than the evidence of plaintiff's witnesses, who also have a natural interest in his success, by reason of relationship or business connection. The plaintiff himself states, in his testimony, that the matters were talked over in "various ways."

Neither can I believe that, supposing that $30,000 was agreed to be the difference in values, plaintiff could have made such a grave and continuous and persistent mistake, with every opportunity of rectifying it, as he claims he did make, in inadvertently binding himself to pay the whole of such difference instead of half.

I concede that such a mistake might be made on a first calculation, without reflection, and might for a moment mislead, but I do not think it is consistent with the ordinary process of human thought, that an intelligent man with full knowledge of all the facts, of mature judgment and experience, should persist in agreeing to pay $30,000 when he only meant to pay $15,000, and especially so when such a mistake not only originated with him, but was persisted in, and of his own accord ratified by him, in various ways, with full and abundant opportunity for reflection, change, rescission or avoidance.

To determine that such a mistake was really made, I must also find that the plaintiff's son made the same mistake. This gentleman is the plaintiff's principal witness, was privy to all the arrangements, present at the interviews, and in continual consultation with his father. He is a person of mature judgment and of superior education, as appears in

evidence, and was naturally interested that his father's interests should be guarded, and that there should be no mistake. He was present when the drafts and final agreements were read and executed. And yet I am called upon to hold that this mistake was participated in by him, and that he allowed his father to sign an agreement binding himself to pay twice as much as the understanding of the parties called for; a mistake, too, purely mathematical, to an amount exceeding $20,000, and one which, on a slight reflection would have been apparent.

It is more natural, more rational to conclude, from the evidence afforded by the verbal testimony, the papers and the *res gestæ*, that the sum of $30,000 was agreed upon to be paid as a liquidated amount, based upon various considerations influencing the parties as to how their several interests would be promoted by a separation.

The elements of thought, too, on which the payment was made, might under the circumstances be not confined merely to the two classes of business.

There was the advantage of the good-will and ancient location of the business, which were to remain with the plaintiff; the mutual personal disagreement between the parties, and a desire to get rid of or introduce certain employes; their various estimates of the past or future profits of either class of business; the relinquishment of certain advantages to which the outgoing party would otherwise have a permanent right; the uncertainty of the payments stipulated for, from a possible loss or failure of the business under the new direction; the abandonment by the outgoing party of control in the management; the various estimates the parties might put upon the book accounts to be assigned to plaintiff, or the expense of their collection, and the uncertain values of the other assets.

Although not called upon to go into the partnership accounts of these parties, or to enter directly into the question of values, I have admitted evidence of such a character as

might indirectly have a bearing upon the question at issue. My duty is not to settle their accounts, to balance the interests of the partiès, or to make an agreement for them. That was for the parties themselves. My province is merely to pronounce upon the fact whether the agreement that was made, whatever it was, was intentionally so made, and without fraud or mistake, quite irrespective of the fact whether either party's judgment was at fault in its estimation of past or future values. In the course of the evidence there is much to show that the written agreement, as made, is not inconsistent with what might, under the then existing circumstances, be consistent with the actual respective interests, or, at any rate, the supposed actual interests of either party.

The way the business has since eventuated is matter of no consideration here. There is no positive evidence on the subject, but there is evidence that the plaintiff has been satisfied to have the agreement carried out as regards the obligations assumed by defendant, and to keep all he, the plaintiff, obtained under it, and has never expressed a desire nor offered to rescind it.

The most controlling fact to my mind in support of the defendant's view, apart from the verbal testimony in the case, and the various attendant circumstances hereinbefore referred to, is this:

The whole data upon which the written agreement was drawn were expressed in writing by plaintiff himself, and sent by him to Mr. Morris, the lawyer who drew the agreement. Both this letter of directions in the plaintiff's son's handwriting, and the draft in the plaintiff's handwriting, were drawn on December 2d, 1872, within a few minutes of each other, and three or four days before the agreement was executed, and on a careful perusal of them they appear to me entirely consistent with the agreement as drawn.

The copy as sent, bears in itself, from the plaintiff's handwriting on it, apart from other testimony in the case, unmistakable internal evidence that it was perused by and assented

to by the plaintiff. I must conclude, therefore, that the giving of these data on which the agreement was drawn, was his own positive act, done with deliberate intent, and after ample time for inquiry and reflection. This conclusion is fully consistent with the other circumstances connected with the transaction.

It is further to be noted that the plaintiff's son says he heard the previous conversations between the parties, and that he wrote the copy of the letter (the draft being then mislaid) from recollection of the first letter, and from having heard the previous conversations of the parties, upon which it was based.

These letters I will more particularly refer to. They are of importance in the case, and are in fact among the controlling features of the *res gestœ*.

They are both signed by the plaintiff, directed to Mr. Morris, the company's lawyer, and are substantially similar, although not *fac similes*, and there are claimed to be points of difference of some importance.

They both state that after talking over the matter it is agreed to make "the bonus of difference" between extract and specifics, "$27,000, instead of $30,000, making $47,000 in all." In the second letter sent, between the figures "$30,000" and the word "making" is inserted the phrase (all underscored) "*that is to say the difference* between our interests," and the words "making $47,000 in all," in the letter sent, are evidently crowded in the body of the letter, in the same handwriting, as if put in after the ensuing phrase, or after the whole letter had been written, as is testified to by the defendant.

Both letters conclude in words almost identical, with the statement that Palmer is to retain his twelve per cent in the specifics, and his position as trustee, all other items to be made to correspond.

Then comes the signature of plaintiff to both letters, and a postscript in the letter sent, to the effect that Hurtt, the

defendant, is to have $14,000 in sixty days, and fourteen per cent on all receipts until "all" is paid. In the draft, or first letter, in plaintiff's handwriting, instead of the words "until all is paid" are the words "until in all $47,000 is paid." This last clause, in the plaintiff's own handwriting, seems conclusive of the fact that he intended to pay $47,000.

I note, as evidence tending to show that plaintiff was aware of the contents of the second letter, when he sent it to Mr. Morris by Hurtt, the defendant, that in the first place, it is signed by him, plaintiff, and thence arises the legal presumption that he read it, particularly in view of his testimony that he forgot whether he read it or not. There are, also, at the bottom of the sheet, before the postscript, which is on the other side, the words "see over," in the handwriting of the plaintiff, although the body of the letter is in that of his son.

These words "see over," in the handwriting of plaintiff, seem to imply that he had read the prior part of the letter signed by him, and finding that it did not contain all that he desired to have expressed, had particularly directed Mr. Morris to the postscript on the other side.

The conclusion, therefore, is forced upon me; so far as these two pieces of evidence are concerned, that the preliminary specific directions to Mr. Morris to draw the contract, were made by the plaintiff, of his own deliberate action, and the agreement, as written, is in accordance with them.

As regards the evidence of Mr. Sutphen, on the part of the defendant, which shows that certain figures were made by the defendant in his, witness' office, which tend to show that the defendant also thought that the basis of payment should be a difference of certain liquidated values, I am not inclined to give it the prominence sought to be given it by the defendant's counsel.

In connection with the declaration of the defendant, it seems nothing more than an effort to explain, algebraically, even the plaintiff's views to be incorrect, on the basis of fact assumed by the witness. The conversation was a year after

the transactions took place; many of the figures were suggested by the witness, and throughout the interview the defendant seems to have made no admissions inconsistent with his theory, even if he could not reduce it to an algebraic figure. He seems to have maintained throughout it, that it was agreed that $30,000 was to be paid him on taking the "extract," and not half of it, and that no exact estimates or inventories were the basis of the contract.

The testimony of Dr. Fred. Humphrey, I confess has not made a strong impression on my mind, qualifying it as he does, by stating that he only can remember the conversations in a general way. I think the weight of his testimony and that of Mr. Bell are fully balanced by the testimony on the other side, of the defendant and his witnesses Palmer, Morris and Johnson, while the various papers, as executed, are very strongly corroborative of the defendant's position.

As regards the other branch of the mistake claimed to have been made, the same remarks as above will apply. I do not think it consistent with reason and probability or the evidence adduced and the time for reflection and reformation given, that the plaintiff would have bound himself to have paid the sum specified without qualification, unless it was with the understanding that the extract stuff, as detailed in the bill of sale, was to be removed by plaintiff, as expressed in the agreement.

The agreement is very plain : on the payment of a certain sum, plaintiff was to have certain things, and the defendant certain things ; and to hold that parties for so long a time as these matters required, both in negotiation and fulfillment, erroneously bound themselves to do a certain thing, expressed in plain language, whereas they meant to do just the contrary, is to deprive words of all meaning and to take from humanity all power of reasoning and reflection.

As a conclusion from not only the positive, but the internal and probable evidence in the case, I do not find that there is sufficient evidence of mistake on the part of the plaintiff to

Humphreys agt. Hurtt.

warrant me in setting aside this deliberate written agree-ment made between the parties. Apart from that I do not find, even if the plaintiff were laboring under a mistake, that the defendant was under such mistake, but entered into the agreement with the understanding that it was the mutual agreement of the parties to be carried out, and parted with value, and changed his status as a stock owner, on the basis of such agreement.

That consequently, even if the plaintiff were mistaken and the defendant not, that there having been no rescission or offer to rescind, so that the defendant might be placed in *statu quo*, I cannot nullify this contract, and impose on defendant a new one, which he had not contemplated. Neither is there any evidence of any willful misleading of plaintiff, or knowl-edge of any mistake on the part of defendant, and a silence kept under it, so that plaintiff, as claimed, was fraudulently misled to his injury.