THE MAHASKA COUNTY RAILROAD CO. v. THE DES MOINES VALLEY RAILROAD CO.

28  437
d124  114
d124  116

1. **Railroad company: DEPOT: CONTRACT.** Where by the terms of a contract, granting to a railroad company certain franchises, the company were not to build or allow " but one other depot" between certain points, it was *held*, that a station at a coal bank, where trains merely stopped to take or leave cars connected with this trade, was not a depot within the meaning of the contract.

2. —— CONTRACT. The directors of a railroad company were, by its articles of incorporation, empowered, with the assent of a majority in interest of its stockholders, to sell and transfer the estate, rights and franchises of the company; *provided*, that no such sale or transfer should be valid until all the debts of the company were paid or arranged. *Held,* that a transfer to another company by the directors, as thus authorized, was not invalid on the ground that the debts were not paid, when it appeared that the debts amounted to a very inconsiderable sum, that the officers of the company purchasing were at the time informed, upon making inquiry respecting it, that

there were no debts, and it also appeared that they had offered, and were still ready, to pay whatever debts might exist.

3. —— POWER OF DISPOSAL. The directors of a railroad company may, when thereto authorized by the language of its articles of incorporation, and in the manner therein pointed out, sell and transfer a part of its uncompleted road-bed, estate, and franchises connected therewith, to another company.

4. —— CHANGE OF LINE. A railroad company may, at least before actual construction of the road, in accordance with its discretion, change its line or route after the same has been fixed.

5. —— ESTOPPEL. In the present case it was *held*, though the action of the directors in transferring the road-bed, etc., was irregular, that the company making the transfer, having permitted the company to whom the transfer was made to take possession of the road-bed thereunder, and make expensive improvements thereon in putting it in running condition, was equitably estopped from asserting any claim of title, or that the transfer was irregular and unauthorized.

*Appeal from Henry District Court.*

THURSDAY, APRIL 7.

THIS was originally, in form, "an action of right," to recover the "right of way, road-bed," etc., extending six or seven miles, between Eddyville and Oskaloosa, and now occupied and run by the defendant.

The plaintiff was organized in 1860, the purpose being to build and operate a road from "Eddyville *via* Oskaloosa, in the direction of Des Moines." Much of the grading was completed between Oskaloosa and Eddyville, a large portion of the ties upon the ground, and the road-bed for that distance about ready for the iron. This was in 1861. From this until 1864, work, from various causes, was suspended, and that already done was more or less injured; the embankments, bridges and culverts had washed down and out, the cuts filled, and the ties were greatly decayed.

The road of defendant was completed to Eddyville, and it was not determined whether from that point it would follow, as it did below, the river (Des Moines) bottom, or there leave the river, taking what was known as the "divide route." The stockholders of the plaintiff corporation are for the most part residents of Oskaloosa and vicinity, and the object of the organization, and in doing the work, was to be in a condition to bring defendant's road by the way of Oskaloosa, or at least divert it from the "river route."

While matters stood thus, and at the time that defendant was about to push its road in the direction of Des Moines, a committee from Oskaloosa (four in number, three of them being directors in plaintiff's company) proposed and agreed in writing, that if defendant would build its road "up the valley, and on the east side of a certain creek," and locate a depot at the nearest and most accessible point to Oskaloosa, etc., then the plaintiff would convey to defendant the road-bed, etc., from Eddyville to Oskaloosa, so far as defendant might run on the same. This was on the 12th of April, 1864.

When this committee returned (for the proposition was made in Keokuk, where they had gone to negotiate on this subject), a meeting of the stockholders was called, — whether in the manner contemplated by the articles of incorporation is left in doubt, as, also, whether a majority of them attended. At the meeting, however, the action of the committee was approved, and it was voted that the road should be conveyed in accordance with the agreement.

By a paper dated April 18, 1864, signed by more than one-half of the stockholders in interest, the directors were empowered to sell and convey the road-bed, etc., to the defendant, "upon the terms and conditions specified in the proposition made by the committee recently appointed by the citizens of Oskaloosa."

On the 29th of the same month (four of the five directors being present with the officers and others acting for defendant), the plaintiff in accordance with the resolve of said directors and the said written contract of the stockholders, entered into a written agreement with defendant, whereby, upon certain conditions, they conveyed to defendant the said road-bed, etc. By this writing, the depot was to be located upon a certain tract of land, and the road completed thereto by a day named. After this, three of the directors, in writing, agreed to change the depot and waive or extend the time for the completion of the road. The depot as thus fixed is some three hundred feet further from Oskaloosa than the place first named, but is more accessible, and all the testimony shows, in the language of the written offer of the committee, that it is placed as near Oskaloosa as it could be without materially lengthening the distance of the road or increasing the grade.

Immediately after the agreement of April, 1864, defendant took possession of this road-bed and these ties, expended thereon between one and two hundred thousand dollars, including depot buildings, switches, water-tanks, etc., and in August its trains were running regularly to the Oskaloosa depot. From that point the road was pushed forward, until extended to Des Moines, in 1865. Of this possession and this work, in all its changes, all of plaintiff's directors and officers, and probably every stockholder,—certainly every citizen of Oskaloosa,—had full notice at the time; and no objection was interposed, nor had defendant any notice of dissatisfaction, until the commencement of this suit in August, 1865.

Under the issues raised by the defendant's answer, and plaintiff's answer to a cross-bill, the cause wa- transferred to equity; there heard upon an immense mass of depositions and documentary evidence, a decree entered in defendant's favor, and plaintiff appeals.

*J. R. Barcroft* for the appellant.

(Brief not found on reporter's file.)

*Henry Strong* for the appellee:

I. To the point that a railroad company may change or relocate its line, cited *Gear* v. *The Dubuque & Sioux City R. R. Co.*, 20 Iowa, 526; *North Mo. R. R. Co.* v. *Lackland*, 25 Mo. 515; *B. & S. R. R. Co.* v. *Nesbit*, 10 How. 395.

II. The meeting of directors at which the resolutions, followed by the contract of sale, were passed, was not unauthorized and rendered invalid on the ground that all of the directors were not present and were not notified, and that the meeting was not held at the regular place of meeting. The testimony shows that the directors had no regular place of meeting. They sometimes met at Union Hotel, sometimes at the bank, sometimes at the law office of the secretary; they had no stated time or place of meeting, but were in the habit of meeting whenever and wherever the president called them together. The matter of notice is of no importance if the members are present. Redfield says: "All the authorities agree, that if the members of the company attend without notice it is sufficient." See *King* v. *Theodoric*, 8 East. 543. So where the by-laws of the company require the meetings of the company to be held at a particular place, and the record or evidence does not show that the meetings were held at a different place, it will be presumed they were held at the place designated. *Daniels* v. *Flower Brook Man. Co.*, 274.

Courts are always reluctant to interfere with the conduct of directors of a corporation, even at the instance of a majority of the stockholders, and ordinarily will not, when such directors have acted in good faith. *State* v.

*State Bank of Louisiana*, 6 La. 745. See also case of *Port of London Assurance Co.*, 35 Eng. L. and Eq. 178.

There is nothing in the articles of incorporation, or in any by-law of the company, fixing any time or place for the meeting of the directors, nor requiring the presence of all of the directors to transact any business of the company. In the absence of such requirement, a majority of the directors constitute a quorum for the transaction of business. Nothing is better settled now than that a majority of directors control, and can perform all legal acts, unless prohibited by the charter. Redfield on Railways, § 6, title "Meetings of Directors;" Angel and Ames on Corporations, 231, 236, 240 *et seq.;* Hammond's Iowa Digest, 265; 6 Iowa, 269; 13 id. 560; 15 id. 293; 16 id. 284; 17 id. 277.

III. Even if the board of directors had no power to sell the old road-bed, yet plaintiff and the corporators and stockholders, composing the Mahaska County Railroad Company, having stood by, with full knowledge of all that was done and of their own claim, and having assented to the transfer, and to the defendant taking possession and making valuable improvements upon the premises, are estopped now from setting up or asserting their claim of title. Such conduct on their part amounts in law to a parol license to the defendants to take possession of and make valuable and permanent improvements upon the premises. 2 Am. Leading Cases on License, and notes.

Two parties own adjoining land, and by parol agree to build a saw-mill on the land of A. (one of them), the other to furnish water-power, the mill to be at joint expense. The grantee of B., being dispossessed, can "recover an undivided moiety of the land on which the mill is situate. It is to be treated as a *license* and not as a parol grant, not conveying fee simple. A revocation

by A. would be a fraud, and equity, to prevent it, will turn the owner of the soil into a trustee, *ex maleficieo.* Equity postpones the title of one who is studiously silent as to the existence of it in the presence of a purchaser from a third person, or one who suffers another to build ignorantly on his ground without informing him of his mistake. *Swarts* v. *Swarts,* 4 Barr, 353.

Plaintiff having stood by when the purchasers of the land at sheriff's sale made valuable improvements, and gave no notice of her title, it operates as an equitable estoppel against her now asserting her title. *Hamilton* v. *Hamilton,* 4 Barr, 195.

Where the owner gave aid and encouragement to keep up and repair the abutment of a dam, the consequent expenditure of the money would, in equity, give a title to the occupant. *Folk* v. *Beidleman,* 6 Watts, 339.

Scott was a member of the city council and of the street committee, and participated in all the proceedings of opening the street through his land. He having stood by and seen the city, without a whisper of objection on his part, make large expenditures and valuable improvements upon the land now claimed by him, his objections now are therefore neither supported in law or equity. *City of Pittsburgh* v. *Scott,* 1 Barr, 317.

A parol license without consideration, where the licensee makes valuable improvements, becomes an agreement for valuable consideration. Such a grant is a direct encouragement to expend money, and it would be against all conscience to annul it. *Rerick* v. *Kern,* 14 Serg. and Rawle, 271.

Parol license, on which a party has acted, cannot be revoked after an expense incurred by licensee. *Lafevre* v. *Lafevre,* 4 Serg. and Rawle, 243.

A parol license from the known agent of a foreign land company, to build a dam and flow the water back

on their lands, may be given in evidence to defeat an action for a nuisance, brought by a purchaser from the company and no power of attorney to the agent need be shown, as would be necessary in conveyance of the fee simple of the land. *McKellip* v. *McIlhenny*, 4 Watts, 317.

"If one knowingly, though passively, suffers another to purchase and spend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterward be permitted to exercise his legal right toward that person." "There is no principle better settled than that which declares, that if one knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterward be permitted to exercise his legal rights toward that person. It would be an act of fraud and injustice." *Carr* v. *Wallace*, 7 Watts, 394.

Chief Justice REDFIELD says: "It is one of the first principles of the Roman civil law, and very early incorporated into the English chancery law, in regard to the title of real estate and valuable erections and meliorations, as they were called, put thereon by the occupier in faith of a title, which subsequently failed for any cause, that one thus benefited by the labor of another should make reasonable compensation." *Pope* v. *Henry et al.*, 24 Vt. 564.

The owner of land, after valuable improvements made by licensee, cannot recover the land, though the license is in parol. *Riecker* v. *Kelly*, 1 Maine, 117; 5 id. 9.

A parol gift of land by a father to his son, with possession, and followed by the son making valuable improvements, is valid, and cannot be defeated under statute of frauds. *Syler* v. *Ekhart*, 1 Binney, 378.

Silence will postpone only where silence was a fraud, which cannot be imputed where the owner is ignorant of his ownership of the land, but positive acts, without regard to the question of ignorance, stand on a different ground, for there his title may be postponed, even without fraud; for where a loss must fall on one of two innocent persons, it shall be borne by him whose act occasions it. *Robinson* v. *Justice*, 2 Penn. 19.

Parol license is valid and cannot be revoked, if at all, without payment is first made for the improvements upon it. *Woodbury* v. *Paishley*, 7 N. H. 237.

The same principle is maintained in the case of *Bridge* v. *Bragg*, 11 N. H. 102.

The owner of land knowingly permitting improvements to be made on land is estopped from afterward setting up title to the same. *Price* v. *Case*, 10 Conn. 375; *Hall* v. *Chafees*, 13 Vt. 157; *Benedict* v. *Benedict*, 5 Day, 158.

"One who has waived his right to have commissioners called to assess damage, and has permitted a corporation to take possession of his land without first having damages assessed, and has permitted them to spend large sums upon it, and constitute it a part of an extensive and valuable public improvement, cannot recover his land upon paying for the improvement." Part of syllabus, *Trenton Water Power Company* v. *Chambers*, 1 Stock. Ch. 471.

Pierce, the owner of the premises, knowingly standing by at the sale of the premises by another, without objecting, is precluded in equity from contesting the claim of that other, and, even if he be ignorant of his own title, if he actively encourage another to purchase of a third party, he is estopped thereby from asserting his title. Silence, alone, will preclude him if he knew his own title. He is bound to speak. *Wells* v. *Pierce*, 7 Foster (N. H.)

503; Story's Equity Juris. §§ 384, 376, 761, 768, 377, 286–289, 285; note on page 692 to § 1237.

Chancellor KENT says: "There is no principle of equity better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares, that if one man knowingly, though he does it passively by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterward be permitted to exercise his legal rights toward that person. It would be an act of fraud and injustice, and his conscience is bound by the equitable estoppel." *Wendell* v. *Van Rensselaer*, 1 Johns. Ch: 354.

"It is a well established rule of equity that where one having title acquiesces in the disposition of his property, for a valuable consideration, by a person pretending to title, and having color to title, he shall be bound by such disposition, and shall not afterward be allowed to set up his own title against the purchaser. And so it has been held, that if one having title stands by while another purchases from a third person, and does not forbid the purchase or declare his own title, he shall be bound — and for a stronger reason, if he encourages it." *Heard* v. *Hall*, 16 Pick.; 2 Am. Leading Cases, 733, and note.

"A person having the legal title, who acquiesces in the sale of the land by another claiming or having color of title to it, is estopped from afterward asserting his title against the purchaser, and ignorance of law cannot generally be set up by the person having the legal title and remaining silent. *Storrs* v. *Barker*, 6 Johns. Ch. 166.

In England, as here, a corporation chartered for one purpose, cannot divert the capital and funds of the company to another and different purpose, and yet if the stockholders stand by in silence, and see this done, they cannot afterward object.

The right of the minority of the shareholders to interfere by way of injunction to restrain the majority from obtaining permission to alter the constitution of the corporation may undoubtedly be lost by acquiescence. *Graham* v. *Birkenhead, etc., Railway*, 6 Eng. L. and Eq. 132; *Bearman* v. *Rufford*, id. 106. Lord Cranworth says: "This court will not allow any of the shareholders to say that they are not interested in preventing the law of their company from being violated." *Ffooks* v. *London and S. W. R.*, 19 Eng. L. and Eq. 9. As where the shareholders knew of the purpose of the directors to apply the funds of the company to a part only of the road, to the abandonment of the remainder, and remained passive for eighteen months, while the directors were applying large sums to the completion of this part only, the court refused to interfere by injunction.

Even if one of the shareholders, who has acquiesced in the diversion of the funds, be joined in the suit with others who have not, no relief can be afforded. See the opinion of Vice-Chancellor Stuart, in the case last referred to.

Judge Redfield, in speaking of the effect of such silence, says: "There can be no doubt of the soundness of this principle, although the effect of its application may be to produce a fundamental alteration in the constitution of the corporation, and thus to enable them to do what they had no power before to do. But this is only applying to the case the principle of implied consent of all the stockholders resulting from silence, which is all that is requisite, in any case, to legalize the alteration of a charter of a private corporation." I need not contend that if silence may change the charter, silence may do the far inferior act, which, in this case, these silent stockholders, in the name of their corporation, are seeking to avoid.

The most that can be said in favor of the plaintiff's position is, that if the act sought to be done be within the ordinary range of the original charter, it may be accepted by a majority, so as to bind the whole company. "But," as ex-Chief Justice Redfield says, "if it be a fundamental alteration of the constitution of the company, it must have either the express or implied assent of all the corporators to make it binding." And further says, speaking of the general rule, that a majority cannot bind the minority by an act, *ultra vires;* "but this rule will be understood with some limitations. I have no hesitation in making the assertion, that the effect of silent or implied acquiescence applies with as much force to corporations as to individuals." The same judge states: "An oral permission to take and use land for a railway, is a bar to the recovery of damages for such use, until the permission is revoked;" citing *Miller* v. *The Auburn Railroad*, 6 Hill, 61. "And such license, where executed by the construction of the work, is not allowed to be revoked;" citing *Water Power* v. *Chambers*, 1 Stock. Ch. 471; *Boston and Maine Railway* v. *Bartlett*, 3 Cush. 224.

WRIGHT, J.—The statement of the case sufficiently indicates the facts, so far as necessary to an understanding of the points ruled in this opinion. There are some matters relied upon, however, by appellant, which should, before we go further, receive attention.

1. RAILROAD depot: contract.

1. Thus, by the agreement, the defendant was to "build or allow but one other depot between Eddyville and Pella." Counsel insist that this condition was violated, and therefore plaintiff should recover, or, at least, defendant is not entitled, as prayed in the cross-bill, to have its title quieted. The testimony is clear, however, that the agreement has not been violated in this respect. A station

at a coal bank, where trains merely stop to take or leave cars, for purposes connected with this trade, is not a depot within the meaning of the contract. Nor would a "water station" be any more of a violation of its terms.

2. The sixth section of defendant's articles of incorporation, declares that "it shall be competent for the directors, with the assent of a majority in interest of the stockholders in this company, to sell, transfer, mortgage or dispose of to any person * * * the estate, rights or franchises of which it may be possessed * * * or to enter into a running arrangement with any other company * * * if, in the opinion of said directors, such sale, transfer * * * or running arrangement would facilitate the construction or promote the interest of this company or road. *Provided*, that no such sale or transfer shall be valid until all the debts of this company shall be paid or otherwise arranged." The directors were also given power by this section to connect the road with that of any other company, and to make all contracts as might be thought necessary for the separate or joint ownership in and occupation of their road.

2. —— contract.

And now plaintiff says that its debts were not paid at the time this contract was made, and therefore it is void. The proof is, however, that the debts, if any, amount to a very inconsiderable sum (certainly not more than $100), and that the officers of defendant, at the time of entering into this agreement, made particular inquiries if there were any debts, and were informed repeatedly that there were none, or, if any, they had been or would be arranged. Not only so, but they have since, and do in their cross-bill, offer to pay all debts, whatever the amount, so soon as they may be duly established. Under these facts there would be no justification, either in morals or law, for holding this contract void upon this ground.

3. The objection that the depot was not located at the "nearest and most accessible point," finds no kind of support in the facts. In the first place, there are no words in any of the resolutions or agreements, passed or entered into in connection with this transfer, in terms requiring such location. The offer of the committee used this language, further providing that it was to be on the east side of a certain creek, and at the depot the road was to diverge "from said creek toward the city as far as can be done without materially lengthening the distance or increasing the grade." And if any one fact is better established than another by the immense mass of testimony before us, it is that this depot was located in strict accordance with this part of the contract. Upon this subject there is next to no conflict. The point to be selected was not only to be nearest but most accessible.

And in this connection it is well to make one further remark touching this location. Neither by the offer of the committee, the action of the stockholders, nor by the writing signed by a majority of those in interest, is the *place* for locating the depot specified. By these, as we have seen, nearness, accessibility, divergence toward the city east of the creek, were the guides, and there was no condition that it should be upon any particular tract of land. By the resolution and contract of April 29th, it was to be upon a certain forty-acre tract, and it was changed from this to the present location by the agreement of July 28, 1864. The present depot being, as we have seen, at the most accessible point, at the place clearly pointed to by the terms of the offer, and referred to and affirmed by the stockholders, it would seem to follow that it makes but little difference whether the agreement of April 29th was binding or not. For, if authority from the stockholders was necessary to the exercise of the power by the directors, then the only authority given was to do

just what was done in July, to wit: to select this spot, which met every condition of the contract.

3. —— power of disposal.

4. It is claimed (and we now approach the points most relied on by the appellants) that this contract was, upon the part of plaintiff's officers, wholly unauthorized and void. And this, because (to condense the argument), it entirely diverts the funds of the company from the purposes contemplated by the organization; because it transfers all the rights and franchises acquired for a particular purpose to another and different company with other and different objects; and because it abandoned the construction of a road "by the way of Oskaloosa."

The difficulty, however, in all this argument is, that it assumes as true that for which there is no warrant in the facts of the case. For it will be remembered that the sixth section of the articles of incorporation expressly gives the right to the directors, with the assent of the stockholders, to sell or transfer the estate or franchises of the company whenever, in the opinion of the directors, such sale or transfer would either facilitate the construction of the road or promote the interest of the company. Then, too, the directors, without reference to the interest of the stockholders, were given power to connect the road with any other road, and to make contracts in relation to such joint or separate ownership, use or occupation. And hence it is clear that the charter conferred the power to make such transfer, even though it covered the entire estate of the company — the same being made with the consent of the stockholders, as therein contemplated. And, certainly, there is no rule of law which prevents those constituting a corporation (having reference of course at all times to the rights of third persons) from making such absolute sale or transfer, though it should occur thereby that the object contemplated should be entirely

defeated. Waiving this, however, we remark that the arrangement made, by no means operated to divert the funds to another and different purpose; nor did the company thereby *abandon* the construction of a road "by the way of Oskaloosa." Under it the road was brought very much nearer to Oskaloosa than before, and very much nearer, possibly, than it ever would have been but for the action of the directors. Then, again, plaintiff still has a legal existence — has had all the time — there has been no surrender of its franchise, nor of all its effects. It still owns the road-bed (and possibly the right of way), from a point near the present depot to the city, and there is nothing, so far as we can see, in the least in the way of constructing a road from a point on defendant's road, by the way of Oskaloosa, in the direction of Des Moines. By the agreement under consideration, the enterprise, apparently, has been pursued and forwarded just as far as the length of line to be built has been decreased.

If the sale was of all rights, therefore, it would not necessarily be invalid. If, however, there was no authority to do this, the objection cannot avail, for the contract did not undertake to, and did not in fact operate to, surrender all privileges, nor to abandon the object of the corporation. For the company could still locate, construct and operate a new line of road from "Eddyville *via* Oskaloosa, in the direction of Des Moines." Its power is, by no means, exhausted by the location of one line. The organization was under a general law — not a special charter. It was not held, as under a charter from parliament, in England, to build its road over particular lands. The route may be fixed, then changed, and changed as often as may be deemed necessary (before construction, certainly), the company of course being liable to costs in connection with further

4. —— change of line.

assessments and such incidental liabilities as may arise from inconvenience or trouble, or otherwise, to landholders. *Gear* v. *Dub. & S. C. R. R. Co.*, 20 Iowa, 526.

5. There are, however, very many objections taken to the manner of exercising the power: as that the stockholders never assented to the transfer in the manner contemplated by the charter and the law governing corporations and the rights of the stockholders; because all the directors did not sign the agreement; and also because they were entered into at meetings held without notice, and at unusual places, or at places other than those provided for transacting business.

5. —— estoppel.

We are strongly induced to believe that the assent of a majority in interest of the stockholders was given to this transfer, in strict accordance with the articles of incorporation. If so, as this is the essential consideration, when looking at their rights or the rights of the corporation, as we now are, from an equitable standpoint, there would be little left of this part of the case. For as by the law governing, a *majority* of the directors could enter into the agreement, we should not esteem it our duty to inquire whether the meetings at which the terms of the agreement were fixed were held in the *very room or rooms* in which the directors usually held their meetings, nor whether the notices of those meetings were in all respects strictly formal and regular. And especially so, as it is doubtful whether they had any office at which their meetings were regularly held. Not only so, but there is proof tending to show that all had notice, and that there was a concurrence afterward by those absent in the action of those present. Then, too, as perhaps too often occurs under a general law, which allows these associations, for any purpose or object, from the making of the smallest and least useful article or implement to the construction of a national railway or tele-

graph line, these directors held their "offices in the field," carried their books and records in their pockets and hats, being equally, with the individual, at all times ready and competent to transact business in connection with the work intrusted to their hands. The stern, strict rules for which plaintiff's counsel insists, are not, and should not under such circumstances be, applicable.

If we should waive all these considerations, however, it would be sufficient to place this part of the case upon the single ground that plaintiff is estopped from now claiming this property or interfering with the defendant's enjoyment of it. As already shown (by the statement), the stockholders and directors stood by, with a full knowledge of all the facts; of all that was done; of their claims; of the thousands of dollars being expended by defendant; of the fact that defendant was day after day placing its property, upon the faith of this agreement, in a condition that constitutes it a part, and a large part, of *a very extensive and valuable public work*, and upon no legal or equitable principle can they be allowed now to recover this property. The considerations leading to this conclusion are many, for the most part fundamental in their origin, and well sustained by the authorities. This opinion is already too extended to allow more than this brief statement of the proposition. The authorities in brief of appellee's counsel, however, fully sanction it.

Affirmed.