LEVERETT *et al. v.* The Middle Georgia and Atlantic Railway Company *et al.*

1. Where by its charter a railroad company was authorized to construct a railroad from one designated town to another, and to extend "the main line of its railroad" to a named city so located that in order to reach it the road would naturally pass through the town to which it was to be first constructed, and "at" which, under the charter, the principal office of the company was to be located; and there being in the charter other expressions indicat-

v 96–25

ing a legislative intent that the main line of the railroad should pass through the corporate limits of that town, the charter will be construed as so meaning.

2. Where under such a charter a railroad company did in fact locate and construct a portion of its main line within and through such corporate limits, and operate the same for a considerable period, the company could not thereafter, without further legislative authority, so change the location of its main line as to practically "side-track" the town in question, materially injure it as a business or commercial center, and destroy or greatly reduce the value of the property of its citizens; and in such case these citizens are entitled to invoke the powers of a court of equity to prevent by injunction a threatened wrong of this character.

June 10, 1895. LUMPKIN, J., declined to participate in the decision of this case, on account of relationship to one of the parties at interest.

Petition for injunction. Before Judge HART. Jasper county. March 13, 1895.

W. F. & H. A. JENKINS, for plaintiffs.

W. B. WINGFIELD, GEORGE & GEORGE and J. S. TURNER, for defendants.

ATKINSON, Justice.

It appears from the record, that in the year 1889 (see Acts 1889, p. 227) the General Assembly granted to the Eatonton and Machen Railroad Company a charter, by the terms of which it was authorized "to lay out, maintain and operate a line of railroad from the town of Eatonton in the county of Putnam, to the town of Machen in Jasper county, in this State." By another section of the charter, this corporation was authorized to extend the *main line* of its railroad, "in as direct a line as practicable, to the city of Atlanta or the city of Savannah in any direction that may be desired in the discretion of its board of directors." It was further authorized "to build such branches along the main line at any time as may be desirable in the judgment of the board of directors." At the same session of the General Assembly, by an amendment to its charter (see page 281 of Acts, *supra*), the name of the corporation thus chartered was changed to that of the Middle Georgia

and Atlantic Railway Company. In accordance with
the terms of its charter, and within the time limited
thereby for the exercise of the franchise conferred, the
railroad company, commencing at a point within the
corporate limits of the town of Machen, constructed its
line of railroad to the town of Eatonton, and thereafter,
from a point within the corporate limits of the town of
Machen, extended its line northward, in the direction
of Atlanta, to Covington; and since the completion of
its line to the latter point, which occurred in 1894, it
has been engaged in running and operating its line of
road as thus constructed, for the transportation of freight
and passengers.  Subsequent to the construction and
operation of this line of railroad, its property and fran-
chises were sold to another corporation, the Seaboard
Company; and this latter company, proposing to change
the main line, commenced negotiations with certain cit-
izens of the town of Shady Dale (another incorporated
town lying contiguous to the town of Machen), look-
ing toward an extension of the main line of said road
from a point which lay outside the town of Machen, as
that town was located at the time of the construction
of the main line, so as to cause the same to run through
and near the center of the town of Shady Dale, thus
leaving that portion of the original main line which ex-
tended into the town of Machen, as a spur-track, and
abandoning that portion of the main line as such lying
beyond the town of Machen between that town and the
point where the proposed extension would intersect with
the main line.   While these negotiations were pending,
and before the construction of the proposed line through
Shady Dale, certain citizens of the town of Machen filed
a petition, praying an injunction, and thereby sought to
restrain the railroad company from making the change
proposed.   The facts above stated were alleged; and in
addition thereto, it was alleged that upon the faith and

strength of the construction by the railroad company of its line in accordance with and under the charter power conferred, they had invested considerable sums of money in the purchase and improvement of property within the town of Machen, and in the establishment of certain business and industrial enterprises. They alleged, that if the railroad company were permitted to change its line, it would deprive them of those facilities of commerce designed to be conferred upon the citizens of the town of Machen, and of its position on the main line as constructed, which, by virtue of the construction of such railroad under the charter, they had theretofore enjoyed. It was alleged, that the practical effect of the change of the line would be to destroy the town of Machen as a commercial center, and, because of its inaccessibility, render it undesirable as a place of residence; and that the proposed diversion of the line would result in great pecuniary loss to them, which was incapable of estimation in money and was otherwise irreparable. The respondent answered, admitting incorporation of the railroad company; admitting the construction of the railroad as hereinbefore stated; that it had purchased the franchises of that company and all of its property, and now owned and was operating it. It admitted the proposed change in the line, but denied that it was influenced to this act by any ulterior design, or by any purpose to injure the citizens of the town of Machen, or to perpetrate a fraud upon them. It denied that the change designed was with the purpose to promote the welfare of the citizens of Shady Dale at the expense of the citizens of Machen; but alleged as a reason for the proposed change, the difference between the cost of constructing and maintaining the new line and the cost of maintenance of the old line, involving the construction and maintenance of expensive trestles and bridging, which appears to be not inconsiderable; all of which would be avoided by the

change proposed. It denied that in so doing it violated any of the provisions of its charter, or was guilty of any wrong-doing of which the citizens of Machen had any right to complain. It was further denied by the railroad company that it intended to remove its line of railway entirely from the town of Machen, but, on the contrary, affirmed that it was its purpose, by the maintenance of a spur-track, to give to the people of Machen such facilities as the commerce of the town might from time to time require. Upon the hearing of this case, upon the bill and answer, each respectively supported by a large volume of testimony from those interested in the result, the circuit judge denied the injunction sought, and to this ruling exception was taken.

1. The powers conferred upon the railroad company are such only as are derived from its charter; and such powers as are not expressly conferred and as do not necessarily arise by implication, are to be taken as denied to it. It is a creature of the law, strictly speaking, possessing none of the attributes which pertain to a natural person, save only such as are conferred upon it by its creator. Its right then, after having once located its line of road, to abandon the line upon which it was originally constructed and adopt another, must be determined according to the provisions of its charter. We are not called upon to inquire whether, having constructed its line between two designated points stated in the charter, for its own convenience, at any point along the line of its road, it might change its location to avoid particular obstacles. But the question is, whether, being authorized to construct its road between two points designated in the charter, it would be authorized so to construct its road as not to touch these two designated points. It will be observed that, according to the specifications of the charter, the railroad company was authorized to build a railroad from the town of Eatonton

to the town of Machen. The town of Machen had been incorporated; it had a local *situs*, and was the objective point to which the proposed road was to be constructed. Therefore, according to the very terms of its charter, it had no power to build a railroad which did not touch the town of Machen as one of its objective points. The further provision of the charter, to the effect that it might extend its main line to Atlanta or Savannah in this State, likewise treated the town of Machen as an objective point, for that provision authorized it to extend the main line in as direct a line as practicable to the city of Atlanta, or to the city of Savannah. Machen having been designated as the objective terminus of its main line, then an extension to either of the above points must necessarily have been from the town of Machen. In the construction of its main line as originally laid out, the railroad company placed this construction upon its charter provisions, and proceeded to build its road from Eatonton to Machen, and from Machen, in the direction of Atlanta, as far as Covington. If it had been free in the first instance to have commenced the extension of its main line from a point outside of the town of Machen between that town and Eatonton, it is bound now by its election to build the line from the town of Machen to Covington. It had no authority under its charter to construct more than one main line, and inasmuch as, under that charter, it has elected to construct the line at present operated by it, there is no authority of law for the construction of another main line. That the town of Machen was designed by the legislature to be upon the main line of this railroad, cannot be doubted when it is borne in mind, not only that this town was designated as the objective point of the road, but it was likewise provided that the principal office of the corporation should be located at the town of Machen. If we took the liberty of saying that this railroad company

was free, at its election, under the charter now under consideration, to so construct its line as not to touch the town of Machen, we would substitute, as to its location, for the positive direction of the General Assembly, the discretion of the directors of the railway company. If this discretion were allowed to control, it might suit the convenience of the board of directors to locate an entirely new main line between different objective points, and thus authorize the construction of a railroad where none was authorized by the General Assembly. We are fully persuaded, from an inspection of this charter, that the legislature designed the construction of a main line of railroad from Eatonton to Machen, with the right of extension of such main line in as direct a line as practicable to the city of Atlanta or Savannah as the railroad officials might see proper. That this interpretation was, in the first instance, placed upon its charter by the railroad company, we think is made clear by its election to locate its road upon the line upon which it was first built. Having, therefore, elected to exercise the charter powers once, no other election is authorized by the charter, and none other should be allowed.

2. The plaintiffs in this case relying, as they had a right to rely, upon the presumption that the railroad company in the construction and maintenance of its road would conform to its charter provisions, upon the strength of this presumption have made large investments at this point. According to the evidence, the town of Machen had grown to be a commercial centre of no mean consequence; though it must be allowed that there is other evidence that the value of the property of the citizens living in that town was of comparative insignificance. It is true it is denied by the railroad company that it has a purpose finally to abandon Machen to its fate. It is true it is proposed by the railroad company to run a spur-track into the town of Machen, and afford

to it such facilities as the commerce of the town might from time to time require. It may be well conceived, however, how such an arrangement might result in injury to the business of the town. The inconvenience of handling the business by means of a spur-track would necessarily be greatly increased as compared with the transaction of the same business over the main line. At all events, the charter makes no provision for the maintenance of a side-track into Machen. Its requirement is that the line of road itself shall be built from Eatonton to Machen, and may be thence extended to either of the points designated in the charter., Those persons who have invested money upon the faith of this contract between the railroad company and the State, are entitled to have that contract performed. They are entitled to have the railway company comply with the terms of its charter in this respect, not because of any public inconvenience which might necessarily result from its breach, but because in their own estates they suffer a special, particular damage in which the public in no manner participate. The threatened injury, if permitted, would result in irreparable damage to them and their property; and it can never be allowed that, under such circumstances, a railroad company can be permitted to violate its charter to the injury of the citizen, and leave him without redress. If such a principle were once admitted, the great cities in this country, with all their commercial interests, would be practically at the mercy of the owners of railroad property. As an illustration, the Central Railroad chartered from Macon to Savannah, the Macon & Western Railroad from Atlanta to Macon, the East Tennessee, Virginia and Georgia Railroad from Atlanta to Macon, and the Macon and Brunswick Railroad from Macon to Brunswick, might reach the conclusion that time and money could be saved by so changing their lines as to leave Macon, the objective point of each of

them, entirely off of their lines of road.   While such a condition of things is scarcely conceivable, yet, to allow the principle here invoked, would be to admit the right, and, once admitted, the establishment of these great arteries of commerce becomes dependent, not upon the will of the General Assembly, but upon the discretion of the different boards of directors which may from time to time be elected to serve the interests of the railway companies.   These considerations lead us to the conclusion, that not only was it the duty of this railroad company, in the construction of its line of railroad, to locate its main line within the corporate limits of the town of Machen, but that, being once so located, those who upon the faith of this fact have invested their money are entitled to have the status so established maintained until such time as the General Assembly shall see proper to enlarge the powers of the corporation.

Let the judgment of the court below be   *Reversed.*