BROWN *et al. v.* ATLANTIC & BIRMINGHAM· RAILWAY COMPANY.

1. Where a railroad company to which has been given the power to choose its particular route between designated termini has exercised its discretion in this regard, its power of choice is exhausted, and it can not subsequently change its location without express legislative authority.

2. The Civil Code, § 2171, does not authorize a railroad company which obtained its charter from the secretary of State under the general law for the incorporation of railroads, after having located, constructed, and put in operation its road, at its mere volition to tear up such road, or a section thereof nineteen miles in length, and relocate the same at a different place; nor is such authority conferred although the portion of the road sought to be taken up and relocated lies outside the limits of a town or city.

(a) The defendant appears to be the successor to the road and franchise of the original company locating and constructing such road; and is so dealt with in this decision.

3. Where a railroad company owned two lines which crossed or separated from each other at an acute angle, a general allegation in an answer to an application for injunction to prevent the tearing up of part of one of them, to the effect that the defendant had leased another road which connected its two lines at a point on one of them some nineteen miles from the point of union, and that it could thus operate its trains by this route and furnish as good service to the public and did not need and could not profitably operate one of its lines between such point of union and the point where the leased line touched it (not showing the terms or length of the lease, nor even its existence, except by the general statement in the answer), did not furnish sufficient reason for allowing the intervening section to be torn up, and to prevent an injunction to stay such action until a final trial could be had at the instance of persons living and doing business along the line so to be torn up, and having stations thereon where they made shipments, and who would be specially injured by such action.

4. The fact that the company had begun to tear up its track before the injunction was applied for to restrain the completion of such action, if wrongful and working special damage to the plaintiffs, will not furnish a reason for refusing to enjoin it from proceeding with the work.

5. A mandatory injunction to require the relaying of a substantial portion of the track which had been torn up, and the operation of the road, was not sought at the interlocutory hearing in the case. If it were, to that extent it would be denied.

6. If wrongful action was about to be taken which would work special and irreparable damage to the plaintiffs, not merely such as would be shared in by the general public, they could apply for an injunction to restrain it.

7. The facts of this case, as disclosed by the pleadings and evidence in the record now before us, do not make such a case as to be controlled by the discretionary action of the presiding judge in granting or refusing the injunction.

8. In a case of the character indicated by the preceding notes, an injunction will not be denied on the ground that the plaintiffs have an ample remedy at law, or on the ground that the damages complained of are not irreparable.

Submitted March 3,—Decided August 13, 1906.

Petition for injunction. Before Judge Parker. Ware superior court. January 20, 1906.

Brown and others filed their petition against the Atlantic and Birmingham Railway Company, seeking to enjoin the defendant from tearing up, removing, or abandoning a section of one of its lines of road about nineteen miles in length. They alleged, that along the section which the defendant intended to tear up they lived, owned property, and did business; that the road ran through or near their lands; that there were several stations on this section of road, at one of which one of the plaintiffs had located, at large expense, a "general cross-tie business" and shipped the output of the business over this line of road; and had made investments for the purpose of doing "a turpentine business," that this was the only line running and operating through these places; that the other plaintiffs were the owners of large tracts of real estate along and contiguous to the line of road, and some of them owned and operated farms near it, and had, upon the faith of the location and operation of the road, made valuable improvements on their property; that the defendant was proceeding to tear up and abandon its road between Bushnell and Ocilla, which includes the section above referred to, and that to permit this to be done would work irreparable injury to the plaintiffs; and cause damage which, on ac-

count of the nature of the investment and the depreciation in value of business, would be incapable of being measured by the rules of law.

The defendant admitted that it intended to take up its line between the towns of Bushnell and Ocilla, but it claimed that it had the right to do so. It denied that plaintiffs would be injured as claimed, or were entitled to any injunction. It alleged that it had two lines of road which separated from each other at the town of Bushnell, at an acute angle; that from Bushnell to Ocilla was nineteen miles; that it had leased another road which connected a point on the more northern line of its railroad, called Osierfield, with Ocilla, and that thus it had a line from Bushnell to Ocilla by way of Osierfield. The distance from Bushnell to Osierfield is eleven miles, but it was alleged that the two lines were only about three. miles apart, and the distance by that way not much longer than by the other; that the public could be as well or better accommodated by this line, and that on account of the maintenance, and the small amount of business done on the section of the direct road between Bushnell and Ocilla, it was not remunerative to operate trains by that route. It was further alleged that somewhat more than four miles of the track had been removed before the restraining order was obtained, and that the change in plan by the abandonment of the old road would not "make any greater distance than four miles for transportation of any freight to be delivered at other points in lieu of any point on the old road." It appeared that what was originally known as the Waycross Air-Line Railroad Company, having a line of road extending from Waycross to Fitzgerald in Irwin county, and a further line under construction extending beyond that. point to Cordele, changed its name to the Atlantic and Birmingham Railroad Company, increased its capital stock, and obtained an amendment to its charter authorizing it to extend the road to the Alabama line in the direction of Birmingham, to build a branch in the direction of Atlanta, and obtain the benefits of the general laws on the subject of railroads incorporated by the secretary of State. This is now held by the defendant. The Brunswick and Birmingham Railroad Company was chartered for the purpose of building and operating a railroad from Brunswick through various counties, including that of Irwin, to a point on the Alabama line, the purpose being to continue

the road to the cities of Montgomery and Birmingham in that State. The defendant became the purchaser of that road, which, according to the evidence, extended from Brunswick to Nichols, where it joined the defendant's railroad, and then from a point westward of this junction (namely Bushnell) extending westward through Ocilla a distance of some miles to Irwinville. The details of the manner of the purchase do not appear. On the hearing the presiding judge refused the injunction, and the plaintiffs excepted. The other facts, so far as necessary to be stated, are set out in the opinion.

*Charles T. Roan* and *F. Willis Dart,* for plaintiffs.

*King, Spalding & Little* and *Haygood & Cutts,* for defendant.

LUMPKIN, J. 1. Has a railroad company authority, after it has located and constructed its line, to abandon it, or a portion of it some nineteen miles in length, tear up its track, and relocate such part of its line over a different route? "It is generally held that where a railroad company to which has been given the power to choose its particular route between designated termini, has exercised its discretion in this regard, its power of choice is exhausted, and it can not subsequently change its location without express legislative authority. Thus a change can not be made for reasons of convenience, or expediency, or economy merely." 23 Am. & Eng. Enc. L. (2d ed.) 690 (5); *Leverett* v. *Middle Ga. R. Co.,* 96 *Ga.* 392 (in which case the terminus was fixed by the charter; but the reasoning of it is applicable to several of the questions in the case now before us); State ex rel. Little *v.* Dodge City etc. R. Co., 53 Kan. 329, 24 L. R. A. 564, and notes; Lusby *v.* Kansas City, M. & B. R. Co., 73 Miss. 360; Lake Shore etc. R. Co. *v.* Baltimore etc. R. Co., 149 Ill. 272; Ill. C. R. Co. *v.* People, 143 Ill. 434; People *v.* L. & N. R. Co., 120 Ill. 48, 65; Chicago, B. & Q. R. Co. *v.* Chicago, 149 Ill. 457; Brigham *v.* Agricultural Branch R. Co., 1 Allen, 316; Morris & E. R. Co. *v.* Central R. Co., 31 N. J. L. 205; Mason *v.* Brooklyn etc. R. Co., 35 Barb. 373; People *v.* New York & H. R. R. Co., 45 Barb. 73; Moorehead *v.* Little Miami R. Co., 17 Ohio, 340; Little Miami R. Co. *v.* Naylor, 2 Ohio St. 235, 59 Am. Dec. 667; Negus *v.* Brooklyn, 10 Abb. New Cases, 180; Re Providence, 17 R. I. 324; Boston R. Corp. *v.* Midland R. Co., 1 Gray, 340. The authorities differ somewhat as to what will constitute a location within the rule; but after the selection of the route and actual

·construction, they generally concur that the location is fixed. Mahaska County R. Co. *v.* Des Moines Valley R. Co., 28 Iowa, 437; ·4 Am. & Eng. Ry. Cases, 199, 200, note to Western Penn. R. Co.'s Appeal, and cases cited above. Most of the cases cited by defend-.ant in error, when carefully considered, do not militate against ·this position. Several of them are applications for mandamus to ·compel the company to perform certain alleged duties of a public ·character. Thus in Crane v. Chicago R. Co., 7 Am. St. R. 484 (an application for mandamus), the plaintiffs and others were ·shown not to have been deprived of railroad facilities, and there had been public meetings and an agreement with citizens as to the matter. In *Snook* v. *Ga. Imp. Co.,* 83 *Ga.* 61, it was held that a ·change in the terminus of a railroad was such a material change as ·operated to release a subscriber for stock who did not consent thereto. In Northern Pac. R. Co. *v.* Dustin, 142 U. S. 499, an ·effort was made to compel a railroad company by mandamus to locate and erect a station at a certain place, although one had been located about four miles distant. There was evidence to show that the depot actually located best served the interests of the pub-lic in that vicinity. A dissenting opinion was filed by Mr. Justice Brewer, with whom Mr. Justice Field and Mr. Justice Harlan con-·curred. In the course of it is used the following vigorous lan-.guage: "A railroad company has a public duty to perform, as well as a private interest to subserve, and I never before believed that the courts would permit it to abandon the one to promote the ·other." In Mobile & O. R. Co. *v.* People, 132 Ill. 559, 22 Am. St. R. 556, 560, an effort was made to compel a railroad company to maintain a station, although it had erected another about half a mile away, and it appeared that the public would be better served by the change. In the present case, it is not a question of merely .shifting the location of a station a short distance, but of abandon-ing altogether a part of a line, with the stations thereon, leaving .no facilities there at all, and using another line located at a dis-tance from the former location at the widest point amounting to .some three miles.

2. If, after location and construction of the road, statutory au-thority was required, was it conferred? The Civil Code, § 2171, ·is relied on as doing so. It reads as follows: "Said railroad com-pany shall have the power to change the general direction and

route of said railroad from that stated in the original petition, by a two-thirds vote of the capital stock of said corporation, represented in person or by written proxy at any annual or special meeting of the stockholders of said corporation, and, when the same is so changed, shall have the right and power to enter upon, condemn rights of way, and construct said road on the new or changed line as they had on the original line; but no change shall be made in any town or city after the road has been constructed, without the consent of such town or city expressed through its proper authorities; and in case the route is changed after grading is commenced, compensation shall be made to all persons owning lands on the original route which have been injured by such grading or other work on such original route. If no agreement can be made, such amounts are to be ascertained in the method provided for condemning right of way." Plaintiffs in error contend that this does not confer power, after location and construction, to abandon, tear up, and change the location of the road; but that such power of change exists only before final construction. Defendant in error contends that such power exists equally after construction and operation as before. This section is taken from the act of 1892, which was the general act touching the incorporation of railroads. "Statutes authorizing changes in the location of railroads are to be strictly construed." 23 Am. & Eng. Enc. L. (2d ed.) 682 (b). See also, on the general subject, *Mayor of Macon* v. *Macon R. Co.*, 7 *Ga.* 221; *Central R. Co.* v. *Collins*, 40 *Ga.* 582, 625, 637, 638; *Frederick* v. *Augusta*, 5 *Ga.* 561; *Mayor of Savannah* v. *Hartridge*, 8 *Ga.* 23; *McLeod* v. *Burroughs*, 9 *Ga.* 213; *Winter* v. *Muscogee R. Co.*, 11 *Ga.* 438. This section of the original act authorizes the company "to change *the general direction and route* of said railroad *from that stated in the original petition*, . . and, when *the same* is so changed, shall have the right and power to enter upon, condemn rights of way, and *construct said road* on the new or changed line as they had on the original line as set out in sections 9 and 10 of this act." (The italics are ours.) It had been provided that a petition should be filed with the secretary of State, setting forth certain facts, among which were, "the length of the road as nearly as can be estimated, the general direction of said road, the counties through which it will probably run, the names of the principal places from which and to which it is to be constructed." Section 9

declared the powers of the company so incorporated and provided for such examinations and surveys to be made as should be necessary for the selection of the most advantageous route; for the acquisition of property by voluntary grants or purchase; for the laying out of its right of way, not exceeding in width two hundred feet, and to construct the road; for the construction across or along streams, streets or highways; for the crossing or joining other railroads; for the operation of the road as a common carrier; for the erection of buildings, fixtures, etc.; for the regulation and fixing of transportation rates, subject to the State law and the rules and regulations of the railroad commissioners; for the power to borrow money; for the acquisition of other railroads under foreclosure or judicial sale, and the power to reorganize. Section 10 authorized the extending of the railroad or the building of branches, but required that it be done by resolution of the board of directors designating the route of the proposed extension or branch, and after advertising and filing a copy of the resolution with the secretary of State in a manner similar to that required in regard to the original petition. An examination of sections 9 and 10 indicates that the legislature had in mind the making of provisions for the construction and operation of a railroad, not for its reconstruction or removal. Section 12 (Civil Code, § 2171) authorizes the company to change "the general direction and route of said railroad from that stated in the original petition." The language here used is applicable to the changing of the general direction and route, not the railroad after it has been constructed and operated. The original petition was required to contain a statement of the general direction and route of the railroad which it was intended to construct. Reasons might exist which would render such route impracticable, and it was the purpose of the legislature not to restrict the company in constructing its road to an exact compliance with the petition in this regard, provided it should be altered by a two-thirds vote of the capital stock at an annual or special meeting of the stockholders. The change authorized was not from the road as constructed and operated, but from the general direction and route of the contemplated road stated in the original petition. It was also provided that when "the same [the general direction and route] is so changed, the company shall have the right to enter upon, condemn rights of way, and construct said road." These words more properly apply

to an original construction than to a tearing up and reconstruction at a different place. The power to construct the road on the changed line is the same as that set out in sections 9 and 10. Section 9, as has been seen above, has reference to locating and building originally. Section 10, which authorizes an extension of the road, or the building of branches, requires certain proceedings to be had as a condition precedent to the exercise of the right, including advertising and filing a copy of the resolution with the secretary of State. Is it within the range of probability that the legislature intended that if a railroad company should desire to make a short extension beyond the terminus originally contemplated, or to build a small branch road, it should be required to give notice by advertising and filing resolutions with the secretary of State; but that, without any formality whatever, after it had constructed and been actually operating its line it could tear up the whole or part of such line at its pleasure, and relocate it at some entirely different place?

Another expression in the code section above quoted, which strengthens this construction, is the statement that "in case the route is changed *after grading has commenced,* compensation shall be made to all persons owning lands on the original route which have been injured by such grading or other work on such original route." The expression "after grading has commenced" evidently contemplates a change before the construction is completed. Certainly the legislature did not intend to declare that after the building and construction the road might be torn up and removed without any provision being made for compensation, but that if this were done after grading was commenced, but before the completion, compensation should be made. It is contended by counsel for the defendant in error that the power to ·remove and change the railroad after construction anywhere except within the limits of a town or city was conferred by implication from the following language of the section: "But no change shall be made in any town or city after the road has been constructed, without the consent of such town or city expressed through its proper authorities." After a railroad has been constructed in whole or in part, the ·change or alteration of the location of that part lying within the corporate limits of a town or city might cause municipal inconvenience; or, on the other hand, it might be more convenient both

to the railroad and to the city that the location of its tracks should be changed so as to give better service in entering the town or in running through the corporate limits. It was doubtless to protect municipalities from possible inconvenience which might arise to them, and to guard against the broad construction which might be put upon the language of the act so as to affect such towns or cities, that the words last quoted were used. But from the mere use of the words "after the road has been constructed," in connection with such municipal control, the company was not by mere implication given power to tear up all of its lines outside of the corporate limits, or so much as it might desire, and change them at its will. Such a construction would practically give to railroad companies chartered under the general law a general commission to construct, tear up, and reconstruct their lines on entirely different routes at their pleasure, provided only that they did not take up the small portions of the tracks which might be within the limits of a town or city. The act confers no such authority. In 1903 an act was passed having the following caption: "An act to amend section 2171 of volume 2 of the Code of 1895, providing for the change of general direction and route of railroads, by adding at the end of said section authority to the directors and officers of railroad companies to relocate and reconstruct their line between the termini for the purpose of reducing grades and curvatures, and for other purposes." The exercise of this power itself is limited in the body of the act, and it has more special reference to this acquisition or building of a narrow-gauge line. The present case presents no effort to straighten curves or change grades or make small alterations for those purposes; and therefore we decide nothing on that subject. We think it clear that no such power was conferred by the Civil Code, § 2171, as is contended by the defendant.

It is further contended in the brief of counsel for plaintiffs in error, that the defendant company was subject to the rules and regulations of the railroad commissioners, and that one of these rules prohibited the changing of stations without the consent of the commission. But if we can take judicial cognizance of all the rules of the railroad commissioners, this point does not appear to have been made or passed upon by the court below.

It appears that the defendant acquired the tracks and franchises

of the Brunswick and Birmingham Railway Company, but under what character of sale or on what terms does not distinctly appear. Apparently it became the successor of that company, and it is here treated as such both as to rights and duties incident to the position of a railroad company owning and operating a located and constructed road.

3. In discussing this branch of the subject counsel for the defendant in error have treated the proposed change as being a relocation and reconstruction; and have also urged that where a railroad company owns two lines between the same points, it is not compelled to operate both at a loss, if the operation of one would accommodate the public. Whether this rule would apply in Georgia or not need not be determined, because the facts set up make no such case. The defendant in error has acquired two lines of railroad which cross each other or separate at an acute angle. It alleges that at a point some nineteen miles beyond the point of separation it has leased from another railroad company a track some miles in length, extending from one of its lines to the other. It thereupon proposes to tear up and abandon altogether one of these lines from the point of intersection, and to the point where the leased line connects the two. The existence of a lease is alleged in the answer, but beyond this no proof in regard to it was introduced. At most it does not make a case of the ownership of two lines between the same points. What are the terms of the lease, for how long it is to continue, whether the defendant in error has the right to terminate it or abandon the use at its option, or whether its lessor has a right to determine the lease or to resume possession on any contingencies, nowhere appears. Certainly it can not be successfully contended that the mere general assertion of the existence of a lease constitutes a relocation and reconstruction which would be a lawful substitute for the line which it is proposed to tear up. See *Coker* v. *A., K. & N. Ry. Co.,* 123 *Ga.* 483 (5).

A number of the authorities cited on the part of the defendant in error are to the effect that if the charter of a railroad company simply authorizes it, without requiring it, to construct and maintain a railroad to a certain point, it can not be compelled by mandamus to complete the road to that point or to operate a line or branch, or run trains of a certain character, or with certain sched-

ules, at a loss. Without entering into a discussion of these various citations, it may be remarked that the facts in each are quite different from those now presented before us. The present case does not involve the application for a mandamus to compel a railroad to do some act of the character just indicated, or even to rebuild or restore a portion of a line that has been taken up. It is an application for injunction by persons who allege that they will be specially injured, to prevent a railroad company from tearing up its tracks, and abandoning a portion of its line of road already constructed, in order to run its trains over a different route. Probably the strongest case presented for the defendant in error is that of Jack *v.* Williams, 113 Fed. Rep. 823. It is there stated broadly that "In the absence of special circumstances, or an express contract embodied in a charter, the owner of a railroad, whether a corporation or individual, can not be compelled to maintain and operate the same at a loss. The duty arising from the ownership of the franchise is merely to meet the public requirements, and, where the traffic on a road is not sufficient to pay its operating expenses, such duty does not require its operation, and it may be abandoned." It appeared, however, that a short road twelve miles long had been dismantled by a receiver in charge of it, under order of the court. After a sale of it, by intervention it was sought to require the purchasers to rebuild and operate the road. Under a statute of South Carolina, passed after the purchase by private individuals, natural persons were not permitted to operate a railroad without organization into a corporation. It was said: "The receiver having taken up and sold the rails under an order of court entered without opposition, the court could not require the owners to purchase new materials and rebuild the road, on an offer by intervenors to lease and operate the same if restored, especially in view of the fact that the franchise to operate it as a railroad had been forfeited." There is a wide difference between an effort by mandamus to compel action of this character, and a proceeding by injunction to stop the tearing up of a railroad track. State *v.* Dodge City R. Co., 53 Kan. 377, 42 Am. St. Rep. 295; Gates *v.* Boston R. Co., 53 Conn. 333, 343. If the test of profitableness is to be applied, we are by no means certain that the mere selection of two or three small stations, and proof of the amount of business done at them disconnected from a general consideration of the line

on which they are located, could be taken as conclusively showing the right to omit that part of the line altogether, and relocate or run trains by another line partly owned by the same company and partly used it under some character of lease. But it is unnecessary to consider this question.

4. It is contended, that, because some of the track has already been taken up, injunction to prevent the taking up of the rest should be refused. Where the thing sought to be done is completed, it is too late to apply for an interlocutory injunction to prevent it; but there is no rule of law, that because a thing has been begun, injunction will not be granted to stop its completion.

5. It is further urged that in this State a mandatory injunction will not be granted on an interlocutory hearing. And this may be true, if the substantial relief sought is affirmative (115 Ga. 340). But we do not understand that a mandatory injunction to compel action of such a character is sought. If so, to that extent it should be denied.

6. It is also said that if the dismantling of the section of the road involved in this controversy is unlawful, nevertheless the plaintiffs are not entitled to bring this action, but that it should be brought by the State. But if the plaintiffs will suffer special damages, not merely as members of the public, but by reason of their residences and the location of their businesses, and investments, and shipments made by them, and the circumstances disclosed by the evidence, we do not see any reason why they may not bring an action to prevent the removal of the road, if wrongful. This is especially true as to one of them, who testifies that he has made investments and entered upon a business of cutting and shipping cross-ties and begining "a turpentine business" on the faith of the location of the road and its stations, and that a removal would destroy his shipping facilities and irrevocably damage him. *Macon R. Co.* v. *Gibson,* 85 *Ga.* 2 (6); *Savannah Canal Co.* v. *Shuman,* 91 *Ga.* 400; *Leverett* v. *M. G. & A. R. Co.,* 96 *Ga.* 385 (2); *Coker* v. *A., K. & N. R. Co.,* 123 *Ga.* 483; 1 Pomeroy's Eq. Jur. (3d ed.), § 257.

7. Finally, it is said that the judgment of the presiding judge should be affirmed as being an exercise of discretion. We do not think that this result would follow from the evidence in the present case. It is entirely different from the case of `Kirkland` v.

*Atlantic R. Co.,* ante, 246. In that case there was conflicting evidence on nearly every material or substantial issue of fact. And there was also evidence tending to show that the plaintiffs had by laches lost any right they might have had to claim an injunction, if they had any such right originally. Here there is no denial that the defendant is preparing to abandon, tear up, and remove a part of its line of railroad on which are located two or three stations, and along which are situated the plaintiffs' residences and places of business, to which their means of access is by defendant's tracks. True, some other persons living in that section do not think that they will be damaged, and desire the change to be made. But there is little or no conflict as to the fact that the plaintiffs will sustain injury. The real response of the defendant is, that it has the right to make the change and to use its other track from a point where the two cross to another point where it asserts in an indefinite way that it has leased a road connecting the two lines; and that it has the right to abandon and tear up the track some nineteen miles in length, which has heretofore been located and operated by the company under which it holds by purchase.

We do not know what the evidence may show on the final hearing, or whether it will be such as to entitle the plaintiffs to a permanent injunction, nor do we decide whether or not plaintiffs can apply for a mandamus, or whether upon application for it the writ will be granted. These questions will be determined when they arise. What we now hold is, that, under the pleadings and the evidence, the presiding judge erred in refusing to grant an interlocutory injunction to prevent the defendant from further taking up and dismantling its track and road-bed between the points described in the pleadings and evidence, until the final hearing.

8. The damages complained of by the plaintiffs would be of such an irreparable nature as authorized an application by equitable petition for injunction. In 16 Am. & Eng. Enc. L. (2d ed.) 361, it is said: "An injury is irreparable either from its own nature, as when the party injured can not be adequately compensated in damages, or when the damages which may result therefrom can not be measured by any certain pecuniary standard, or when it is shown that the party who must respond is insolvent, and for that reason incapable of responding in damages." See Kerln *v.* West,

4 N. J. Eq. 453. As to injury to business see *Brown* v. *Jacobs'
Pharmacy Co.,* 115 *Ga.* 451. If the plaintiffs' contentions were
true, their remedy at law would be inadequate.

*Judgment. reversed. All the Justices concur, except Fish, C. J.,
absent.*